865 So.2d 387 (2004)
Daetrus L. PILATE, Appellant,
v.
AMERICAN FEDERATED INSURANCE COMPANY and Mark Guillory, as Agent, Servant and Employee of American Federated Insurance Company, Appellees.
No. 2002-CA-00657-COA.
Court of Appeals of Mississippi.
February 10, 2004.
*388 Ellis Turnage, Cleveland, attorney for appellant.
Robert P. Thompson, Ridgeland, Lyn Butler Dodson, attorneys for appellees.
EN BANC.
GRIFFIS, J., for the Court.
¶ 1. Daetrus L. Pilate filed a bad faith action against American Federated Insurance Company ("AmFed"), his employer's workers' compensation carrier, and Mark Guillory, the claims adjuster for and employee of AmFed, for failure to adequately and promptly investigate and timely pay Pilate's claim for temporary total disability workers' compensation benefits. The Circuit Court of Sunflower County granted the motion for summary judgment filed by AmFed and Guillory. Pilate now appeals. Finding no error, we affirm.

FACTS
¶ 2. On January 21, 1995, Pilate was employed at International Plastics Corporation ("IPC") in Drew, Mississippi. Pilate, a material handler, was instructed to move a large stack of chairs. While attempting to move the chairs, he felt a muscle pull in his back. He continued to work and completed the rest of his shift, but failed to immediately notify his supervisor about the injury he had suffered.
¶ 3. A day or two after he was injured, Pilate returned to IPC and informed his supervisor, Homer Fair, that he had injured his back while lifting chairs and was unable to work. The following day, Fair completed and delivered an on-the-job injury report to Dorothy Cummins, an IPC secretary.
¶ 4. Pilate was examined and treated by a several doctors for his injury. On January 23, 1995, Pilate sought initial medical treatment from Dr. Walter Gough. Dr. Gough diagnosed Pilate with low back pain and ordered x-rays. The x-rays revealed an old compression of the L1; otherwise, everything was normal.
¶ 5. On February 1, 1995, Pilate sought medical care from Dr. Nate Brown in Cleveland. Pilate visited Dr. Brown on February 8, February 20, April 19, May 3, and June 20, 1995. Dr. Brown's records indicated that he saw Pilate on February 1, 1995, and Pilate indicated he had a history of low back pain following a work accident on January 21, 1995. Dr. Brown diagnosed Pilate with lumbar strain and released him to return to work on February 15, 1995. Dr. Brown eventually referred Pilate to Dr. Rommel G. Childress, an orthopedic specialist in Memphis.
¶ 6. Dr. Childress diagnosed Pilate with an acute lumbar spine strain and provided medical care to Pilate from February 23, *389 1995 through July 31, 1996. Dr. Childress concluded that Pilate reached maximum medical improvement on May 3, 1995, and assigned Pilate a permanent partial impairment rating of five percent.
¶ 7. On April 10, 1995, Pilate filed a petition to controvert with the Mississippi Workers' Compensation Commission (the "Commission"). The Commission sent a copy of Pilate's petition to IPC. Upon receipt of the petition, IPC sent the petition to AmFed, its workers' compensation insurance carrier.
¶ 8. On April 27, 1995, Pilate's claim was assigned to Guillory.[1] Guillory was an employee of AmFed and was assigned as the claims adjuster with responsibility for Pilate's claim. On April 28, 1995, Guillory contacted Ellis Turnage, Pilate's counsel of record on the petition, and began communication on Pilate's claim. Guillory requested, and was granted, a thirty-day extension of time to file an answer to Pilate's petition. Guillory also requested that he be allowed to take Pilate's statement; Turnage refused this request. On May 10, 1995, the Commission entered an order granting the extension to respond to the petition.
¶ 9. On June 1, 1995, Guillory initiated AmFed's efforts to obtain medical records from Pilate's treating physicians.
¶ 10. On June 2, 1995, T.G. Bolen, as counsel for AmFed, filed AmFed's answer to Pilate's petition. In its answer, AmFed admitted that Pilate suffered an injury but denied the existence of a disability.
¶ 11. On June 21, 1995, AmFed received Pilate's answers to discovery. With the answer, Pilate failed to produce any medical records and refused to execute a medical authorization form.
¶ 12. From June 2, 1995 through September 15, 1995, Guillory was actively engaged in obtaining medical records from Pilate's doctors. On September 14, 1995, Guillory received the last of the medical records that he had been requesting.
¶ 13. On October 6, 1995, AmFed's counsel took Pilate's deposition. On October 17, 1995, Bolen wrote Guillory and provided a synopsis of Pilate's deposition testimony. Bolen advised AmFed that he was of the opinion that Pilate's claim was "probably" a compensable injury. Bolen advised Guillory to obtain all of Pilate's medical records and that an independent medical exam ("IME") should be scheduled before proceeding further, in order to determine the amount of the compensable disability. Bolen also indicated that Pilate was scheduled to again see Dr. Childress on October 30, 1995.
¶ 14. On December 6, 1995, Bolen wrote Guillory to advise that Pilate missed the scheduled IME and that it had been rescheduled.[2] Bolen also advised of an "outrageous settlement demand" and concluded that he believed that Pilate's claim was worth only a few weeks of temporary total disability.
¶ 15. On January 19, 1996, Guillory and Bolen discussed the status of the case. Based on the medical records and Dr. Childress's letter of May 13, 1995, AmFed decided to pay Pilate temporary total disability from January 21, 1995, through May 3, 1995. On January 22, 1996, Am-Fed tendered a check to Pilate in the amount of $2,635.18, for temporary total disability during this period.
*390 ¶ 16. Pilate's workers' compensation claim continued. On September 16, 1996, a hearing was held before an administrative law judge. The issues included a determination of (a) the date Pilate reached maximum medical improvement; (b) the existence and extent of any additional temporary total disability benefits due; (c) the existence and extent of any permanent disability benefits due; (d) whether any penalties under Mississippi Code Annotated Section 71-3-37(5) apply; and (e) whether IPC and AmFed have the right to direct the administration of a work hardening program as recommended by the IME physician.
¶ 17. On December 11, 1996, the administrative law judge issued an order finding that Pilate was entitled to temporary total disability benefits from January 21, 1995 through May 3, 1995, which had already been paid, plus a ten percent penalty for failure to timely pay benefits as provided by statute. The administrative law judge concluded that Pilate was not entitled to "any additional workers' compensation benefits beyond those he has already been paid," rejecting Pilate's claim for any permanent partial disability benefits. The penalty was paid on December 11, 1996.
¶ 18. Pilate appealed the administrative law judge's decision to the Commission, and on April 16, 1997, the Commission affirmed the administrative law judge. Pilate then appealed the Commission's decision, and on November 6, 1997, the circuit court affirmed the Commission. Pilate appealed the circuit court's decision, and on January 25, 1999, this Court affirmed the circuit court. Pilate v. Int'l Plastics Corp., 727 So.2d 771 (Miss.Ct.App.1999).
¶ 19. On April 8, 1999, Pilate filed the present complaint against AmFed and Guillory. In the complaint, Pilate alleged bad faith on the grounds of IPC's refusal to timely report Pilate's injury, AmFed's refusal to adequately and promptly investigate Pilate's claim, and AmFed's refusal to timely pay Pilate's claim for temporary total disability and medical benefits. Am-Fed and Guillory answered the complaint and subsequently filed a motion for summary judgment. The Circuit Court of Sunflower County granted the summary judgment. Pilate now appeals.

STANDARD OF REVIEW
¶ 20. The standard of review for summary judgments is well settled. We employ a de novo review of a trial court's grant or denial of a summary judgment and examine all the evidentiary matters before itadmissions in pleadings, answers to interrogatories, deposition, affidavits, etc. Hurdle v. Holloway, 848 So.2d 183, 185(¶4) (Miss.2003). The evidence must be viewed in the light most favorable to the party against whom the motion has been made. Id. If, in this view, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, summary judgment should be entered for the movant. Id. Otherwise, the motion should be denied. Id.

ANALYSIS
¶ 21. Pilate argues that the circuit court erred in its conclusion that no genuine issues of material fact existed as to whether AmFed and Guillory committed a willful or malicious wrong or acted with gross and reckless disregard for his contractual and statutory rights to timely payment of workers' compensation benefits. According to Pilate:
There are jury questions present as to whether appellees acted promptly, adequately and as to whether an arguable or legitimate basis for delaying the payment of Pilate's worker's compensation claim from January 21, 1995 to January 1996, as to whether appellees committed *391 a wilful or malicious wrong, or acted with gross and reckless disregard for Pilate's contractual and statutory rights for worker's compensation benefits, and as to whether appellees made a prompt and adequate investigation to obtain all medical information relevant to Pilate's worker's compensation claim.
Pilate argues that the evidence presented was sufficient to create triable issues of material fact as to whether the actions of AmFed and Guillory constituted bad faith. AmFed and Guillory contend that Pilate failed to present evidence to establish the required elements of proof.
¶ 22. The Mississippi Workers' Compensation Law provides that workers' compensation is the exclusive remedy available to an employee suffering an injury that arises out of and in the course of employment. Miss.Code Ann. § 71-3-9 (Rev.2000). Nevertheless, the exclusive remedy provision does not bar an injured employee's common law tort action against an insurance carrier for the commission of an intentional tort that is independent of the accident compensable under the workers' compensation scheme. Southern Farm Bureau Cas. Ins. v. Holland, 469 So.2d 55, 58-59 (Miss.1984). "The consideration of misconduct for which punitive damages are sought involves two tiers. The first is legal: a consideration by the court itself whether the claimed misconduct is of such egregious nature that punitive damages in any amount should be considered." Moeller v. Am. Guar. and Liab. Ins. Co., 707 So.2d 1062, 1072 (Miss. 1996) (citing Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1182 (Miss. 1990)). Second, if the court finds that the claimed misconduct is of such serious nature, it is submitted to the fact-finder to determine if it actually occurred and the appropriate amount, if any, necessary to deter its recurrence. Id. (citing Andrew Jackson, 566 So.2d at 1182-83).
¶ 23. In this appeal, the circuit court addressed only the legal question presented in the first tier"whether the claimed misconduct is of such egregious nature that punitive damages in any amount should be considered." Moeller, 707 So.2d at 1072. The circuit court determined that no genuine issue of a material fact was in dispute and that AmFed and Guillory were entitled to a judgment as a matter of law, finding that the misconduct was not of such egregious nature that punitive damages should be considered.
¶ 24. To determine what type of misconduct will justify any award of punitive damages, the Mississippi Supreme Court has held that "if an insurer has a legitimate or an arguable reason for failing to pay a claim, punitive damages will generally not lie." Id. (citing Standard Life Ins. Co. of Ind. v. Veal, 354 So.2d 239, 248 (Miss.1977)). Thus, if the insurer had a legitimate or arguable reason for not paying a claim, the insurer is deemed to have acted in good faith. On the other hand, if the insurer did not have a legitimate or arguable basis for not paying the claim and acted with willful, malicious, gross negligence, or reckless disregard for the rights of the claimant, then punitive damages will lie. To resolve the issue before us, we review whether a genuine issue of a material fact was in dispute as to whether the conduct of AmFed or Guillory rose to the requisite level of misconduct.
¶ 25. Pilate argues that AmFed and Guillory had no legitimate or arguable basis for failing to promptly and adequately investigate his claim, as well as denying him temporary total disability compensation as long as it did, especially considering that it had the necessary information to make a proper assessment long before it made payment to him in January of 1996. *392 AmFed argues that it was justified in not paying Pilate benefits until it could obtain sufficient information to determine Pilate's incapacity to work and the extent thereof. To support its position, AmFed points to Mississippi Code Annotated Section 71-3-3(i) (Rev.2000) which defines "disability" as "incapacity and the extent thereof must be supported by medical findings." AmFed explains that it attempted to obtain all necessary information to make an accurate assessment of Pilate's claim upon its receipt of Pilate's petition to controvert on April 24, 1995.
¶ 26. There are no material facts in dispute. The exhibits attached to Am-Fed's motion for summary judgment and Pilate's response clearly indicate that the parties agree on the underlying facts. Pilate contends, however, that there are issues in dispute. These issues are merely general arguments to be made by Pilate. None of the issues raised by Pilate relate to the consideration of the first tier of Pilate's bad faith claim.
¶ 27. We begin our review by noting that Pilate has not asserted a bad faith denial of payment claim. Instead, the issue is whether AmFed or Guillory committed bad faith in the delay of payment of benefits to Pilate during the investigation of Pilate's claim. Pilate presented no evidence to suggest that AmFed or Guillory ever denied Pilate's claim.[3] Indeed, immediately upon receiving notification of the claim, AmFed complied with its obligation to promptly investigate Pilate's workers' compensation claim. The alleged misconduct occurred while the claim was being investigated and litigated, pursuant to the Mississippi Workers' Compensation Act and the rules of the Commission. Upon the completion of the investigation, AmFed accepted Pilate's claim as compensable and paid the benefits due prior to a determination by the Commission. Pilate only claims that AmFed did not pay fast enough.
¶ 28. This issue was squarely addressed by the Mississippi Supreme Court in Caldwell v. Alfa Insurance Co., 686 So.2d 1092 (Miss.1996). In Caldwell, the court reviewed a circuit court's entry of a summary judgment where there was a delay in payment of insurance benefits. Id. at 1093. Keith Caldwell was killed in a head-on collision with a drunk driver. On February 15, 1991, Caldwell's carrier, Alfa Insurance Company, was notified of the accident. The attorney for Caldwell's estate sent a letter to Alfa demanding payment by April 1, 1991. Not receiving payment by that date, Caldwell's estate commenced a lawsuit against Alfa on April 1st. On May 28, 1991, Alfa paid the full sum of the uninsured motorist and med-pay benefits, totaling $202,000. Id.
¶ 29. Thereafter, the lawsuit continued on the claim of bad faith delay in payment. On May 7, 1993, the circuit court granted Alfa's motion for summary judgment. The supreme court affirmed holding that Alfa provided a reasonable explanation for the delay and that a six week delay was not so *393 "unreasonable or egregious under the facts of this case" for the conduct to "rise to a level requiring punitive damages to be considered. Alfa's conduct at most was simple negligence, if that." Id.
¶ 30. The consideration of Caldwell's bad faith claim focused on Alfa's investigation and delay in payment. Id. at 1094. Caldwell asserted that the investigation was merely a pretext to withhold payment and that the delay was "unreasonable and amounted to bad faith." Id. at 1094-95. Alfa argued that Mississippi law imposed a duty to fully investigate all claims and the time spent on the investigation did not rise to the level of an independent tort. Id. at 1095. The supreme court reviewed the details surrounding Alfa's investigation and payment and determined that the circuit court must first decide whether the jury should be allowed to consider punitive damages. Id. at 1096.
¶ 31. The supreme court compared the facts in Caldwell to the holding of Blue Cross & Blue Shield v. Maas, 516 So.2d 495 (Miss.1987), and held:
We find that there are distinctions and similarities between the case sub judice and Maas. The critical factor which distinguishes the case at bar from Maas is that Alfa Insurance Company never denied the Caldwell claim. Caldwell's "constructive denial" argument is unpersuasive. Most cases before this Court have involved the wrongful denial of a claim rather than a mere delay in payment. Moreover, Mississippi law imposes a duty upon insurers to "conduct a reasonably prompt investigation of all relevant facts." Bankers Life and Casualty Co. v. Crenshaw, 483 So.2d 254, 276 (Miss.1985). Alfa argues that it simply acted in accordance with the duty imposed upon it by Mississippi law. We hold that the conduct of Alfa in the case sub judice does not rise to the level of egregiousness as did that of Blue Cross in Maas.

Caldwell, 686 So.2d at 1097 (emphasis added).
¶ 32. The court then reviewed Alfa's investigation and payment of the benefits. There was no factual dispute about the investigation and payment, and the investigation was completed in approximately six weeks. Id. at 1097-98. The Caldwell court compared the delay to the holding in Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829, 835 (Miss.1979), where there was an unexplained eight month delay, and Travelers was aware that the insured was suffering a financial hardship solely because of the delay. The Caldwell court recognized that Alfa's explanation of the delay, to comply with its duty to investigate, was reasonable, and its conduct was not nearly as outrageous as in Travelers or Maas. Caldwell, 686 So.2d at 1098.
¶ 33. The supreme court concluded that the "denial" of the claim was the "linchpin" of whether a claim for punitive damages could be submitted to the jury. Id. The Caldwell court relied on Tutor v. Ranger Insurance Co., 804 F.2d 1395 (5th Cir. 1986), to hold that Alfa's conduct did not rise to the level of gross negligence or an independent tort, which would be necessary to create a jury issue. The Caldwell court reasoned that:
Having established no denial of the Caldwell claim occurred; that the claim was eventually paid; and the duty imposed upon Alfa by law to fully investigate all relevant facts, this Court cannot conclude that Alfa's conduct when viewed in the light most favorable to Caldwell, rose to the level of gross negligence or an independent tort. Considering when payment was made, the most that can be said regarding Alfa's handling of the Caldwell claim is that Alfa was negligent, if that. We hold that the *394 trial court correctly refused to submit the issue of punitive damages to a jury in granting summary judgment to Alfa.
Caldwell, 686 So.2d at 1099.
¶ 34. The dissent dismisses Caldwell and argues that Travelers is more analogous to this case. We disagree. As discussed above, in Caldwell, the court examined the investigation and determined it to be reasonable. While the Caldwell decision does not indicate the level of cooperation by Caldwell, the court in Travelers documented exactly how the Wetherbees attempted to cooperate and assist in the investigation. Travelers, 368 So.2d at 830-31. The Wetherbees promptly allowed Travelers' claims adjuster to inspect their property. Id. at 830. The Wetherbees were examined by the Travelers' claims adjuster. They consented to a polygraph examination. Id. The Wetherbees' attorney provided a list of the contents of their home that were destroyed and an estimate of the cost of repair. Id. at 831. Their attorney itemized the extra living expenses incurred. Their attorney communicated with the claims adjuster and indicated that the Wetherbees were "anxious to cooperate with Travelers so that they may bring their claim to an early conclusion." Id. In addition, the Wetherbees introduced evidence that the Travelers' failure to promptly investigate their claim exhausted their funds because they had to pay for both temporary accommodations and their monthly mortgage payment. Id. at 830. After examining the conduct and actions of both the Wetherbees and the Travelers, the court placed the responsibility for the delay squarely on the shoulders of Travelers and determined that the punitive damage instruction was appropriate. Id. at 835.
¶ 35. Not all delays in the payment of claims are actionable. Professor Jeffrey Jackson summarized the law relating to delay in payment, in his treatise on Mississippi Insurance Law, when he concluded:
Obviously, some delay in evaluating claims is inevitable, legitimate and socially useful. Insurers are entitled, and in fact legally obligated, to investigate fully the legitimacy of claims, and some skepticism in evaluating claims is appropriate. Since an insurer has an obligation under Mississippi law to investigate claims, discharging that duty is not bad faith. However, an inadequate investigation of a claim may create a jury question on the issue of bad faith.
Jeffrey Jackson, Mississippi Insurance Law § 12:5 (2001) (citations omitted). Professor Jackson cites Lewis v. Equity National Life Insurance Co., 637 So.2d 183, 187 (Miss.1994) as authority for the last sentence quoted above. The Lewis court determined that an appropriate, i.e., non-negligent, investigation required the insurer to obtain "all available medical information relevant to the policyholder's claim" and interview all employees or individuals who have "knowledge relevant to the claim." Id. This is the standard by which we evaluate whether AmFed's and Guillory's investigation was reasonable.
¶ 36. Therefore, we must review the factual details surrounding AmFed's investigation and payment of Pilate's claim. It was undisputed that (a) AmFed never "denied" Pilate's claim; (b) AmFed paid Pilate's claim for temporary total disability benefits; (c) after receiving notice of the claim, AmFed complied with the workers' compensation statutes and rules governing litigated claims; (d) Pilate and his counsel failed to cooperate with AmFed by not providing complete medical information; (e) Pilate failed to cooperate with AmFed by refusing AmFed's request for Pilate to submit to an oral examination in April; (f) Pilate's deposition was taken in *395 October; (g) Pilate missed his scheduled independent medical examination ("IME"); and (h) Pilate took no action to bring this matter before the Commission until after the temporary total disability benefits were paid.
¶ 37. We consider AmFed's investigation in several different time periods.

a. January 21, 1995 through April 24, 1995.
¶ 38. Pilate was injured on January 21, 1995. It is absolutely undisputed that Am-Fed's and Guillory's first knowledge of Pilate's claim was on April 24, 1995. Neither AmFed nor Guillory could deny a claim that had not been presented for consideration. Likewise, neither AmFed nor Guillory could be responsible for any delay in payment of a claim that had not been presented for consideration.
¶ 39. Pilate asserts that the law of agency imputes the employer's knowledge of the injury to the insurance carrier, citing Ford v. Lamar Life Insurance Co., 513 So.2d 880, 888 (Miss.1987); Andrew Jackson Life Insurance Co. v. Williams, 566 So.2d 1172, 1180 (Miss.1990); Booker v. Pettey, 770 So.2d 39, 42-44 (Miss.2000). Pilate also cites the following language from Mississippi Code Annotated Section 83-17-1 (Rev.1999), "every person [who performs certain actions] for or on behalf of any ... insur[er] ... shall be held to be the agent of the company ... as to all duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract." Pilate argued that his employer's delay in reporting the injury should be imputed to Am-Fed as the conduct necessary to establish an intentional tort. Mississippi law simply does not support such conclusion.
¶ 40. "In committing intentional torts, the insurance carrier ceases to be the `alter ego' of the employer. Rather, the carrier is involved in an independent relationship with the employee when committing such tortious acts." Southern Farm Bureau Cas. Ins. Co. v. Holland, 469 So.2d 55, 58 (Miss.1984). Thus, to determine whether AmFed committed an intentional tort, the knowledge of Pilate's employer would not be imputed to AmFed. According to Holland, neither AmFed nor Guillory could have committed an intentional tort prior to their knowledge of the claim on April 24, 1995.
¶ 41. Pilate's expert witness, Bill Dumbauld, even agreed when he testified that he had "no problem whatsoever as far as at this point since it is their first notice." Despite Pilate's expert's testimony, the dissent repeatedly argues that AmFed should be liable for the commission of an intentional tort, i.e. the failure to pay for a "whole year," when AmFed was not even aware that a claim existed. Without explanation, the dissent simply disregards the Mississippi Supreme Court's holding in Southern Farm Bureau Cas. Ins. Co. v. Holland, 469 So.2d 55 (Miss.1984). We will not. Neither AmFed nor Guillory were or could have been liable for Pilate's claims before the receipt of notice of the claim, which occurred no earlier than April 24, 1995. The dissent's claim that AmFed denied payment for a "whole year" is unsupported by fact or law.

b. April 24, 1995 through June 1, 1995.
¶ 42. AmFed's first knowledge of the claim came after Pilate initiated the Mississippi Workers' Compensation Commission proceeding, when Pilate filed his petition to controvert, on April 10, 1995. A copy of the petition was sent to AmFed on April 24, 1995. Guillory[4] was assigned as the claims adjuster on April 27, 1995.
*396 ¶ 43. On April 28, 1995, Guillory spoke with Ellis Turnage, Pilate's counsel throughout this matter, and informed Turnage that AmFed had just received the petition. Guillory inquired about the claim. Although he was the attorney who filed the petition, Turnage told Guillory that he had little knowledge about the claim. Guillory then asked Turnage for permission to take Pilate's statement, and Turnage denied this request. Turnage, however, agreed to allow AmFed and Guillory thirty additional days to investigate the incident before responding to the petition.
¶ 44. Guillory promptly proceeded to investigate Pilate's injury and contacted his employer. On April 28, 1995, Guillory spoke with Pilate's supervisor, Homer Fair. Fair told Guillory that Pilate called on (a) January 22, 1995advising he was ill, with no mention of a back injury, and (b) January 23, 1995stating he had hurt his back lifting chairs. Fair had not heard from Pilate since February 8, 1995.
¶ 45. On May 2, 1995, Turnage sent a letter to the Commission confirming he had granted AmFed thirty additional days to respond to the petition. The Commission entered an order reflecting the extension on May 10, 1995.
¶ 46. On June 1, 1995, based on the information available, AmFed answered the petition and admitted that Pilate suffered an injury, but denied the disability. In preparing its answer, AmFed's knowledge was limited because: (a) Pilate's petition provided no medical documentation, (b) AmFed's request to examine Pilate about the injury and his disability was denied, and (c) Turnage's admission that he knew little about the claim. Thus, through June 1, 1995, Pilate failed to provide any documents or information to assist AmFed in its investigation.
¶ 47. AmFed's answer asserted that there was a legal distinction between an injury and disability. A "disability" is defined, in Mississippi Code Annotated Section 71-3-3(i) (Rev.2000), as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." Pilate's expert, Bill Dumbauld, testified:
Q. First of all, you agree that you need medical documentation to support a disability?
A. Yes, I do.
Q. And you have already established that the claims procedure that you set up you require that medical documentation before you can begin payment of a claim, right?
A. Yes.
...
Q. Can I, if you are still unable to determine whether there is an ongoing disability do you, do you require in your technical manuals for them to begin payment without medical support?
A. No, you wouldn't pay without medical support.
Q. Why is that?
A. Because until you have medical support you do not know whether or not you owe the claim.
Q. So, let me make sure that we are in agreement here. If you've got a claim that is questionable as far as *397 the extent of disability, you do agree that you would need medical support to justify paying the TT[D]?
A. Correct.
...
Q. Okay. And we further went through the steps that Mark Guillory did between 4-27-95 and June 1, `95?
A. Right.
Q. And you agreed that he was aggressive and there is nothing else that he really needed to do, right?
A. I'll, let me subtract the word aggressive and I will just simply say that he did what would normally be done at that stage.
Q. Okay. You have no problem with what he did at that stage?
A. No, I do not.
¶ 48. Any delay through June 1, 1995, was caused not by AmFed but by Pilate or his counsel. AmFed sought to investigate Pilate's claim in a prompt manner. It is undisputed that AmFed asked for immediate access to Pilate and all of the information available to Pilate or his attorney, which would have included relevant medical records that were or should have been readily available to Pilate or his attorney. Pilate chose not to cooperate or provide the necessary information. Pilate's assistance and cooperation at this early stage certainly could have expedited AmFed's investigation and the timely payment of the claim.

c. June 1, 1995 through September 14, 1995.
¶ 49. From June 1 through September 14, 1995, AmFed and Guillory were actively investigating Pilate's claim. The record reflects that Guillory sent multiple requests to Pilate's doctors requesting medical records. Some doctors responded with minimal information or provided the information in a piecemeal manner.
¶ 50. On June 21, 1995, AmFed's attorneys received Pilate's answers to discovery. Pilate had an early opportunity to provide AmFed with complete medical records and sufficient information to substantiate his claim. Nevertheless, despite the fact that Pilate was required to fully answer the discovery and produce all documents requested, Pilate provided no medical records and refused to execute a medical authorization to allow AmFed access to his medical records. Pilate failed to cooperate and provide the information that he was required to provide under the procedural rules of the Commission.
¶ 51. On June 30, 1995, Guillory requested medical records from Doctors Tilton and Gough. Dr. Tilton advised that he had not seen Pilate. Dr. Gough's medical records were received on August 1, 1995. Dr. Gough's records reflected that he saw Pilate on January 23, 1995, with a diagnosis of low back pain. He obtained an x-ray that revealed an old compression of L1, otherwise normal.
¶ 52. Dr. Brown's records indicated that he saw Pilate on February 1 and that Pilate had a history of low back pain following a work accident on January 21, 1995. Dr. Brown diagnosed Pilate with a lumbar strain and released him to return to work on February 15, 1995. Dr. Brown's medical records were not received by AmFed until September 14, 1995.
¶ 53. According to Pilate's expert witness, Bill Dumbauld, it was reasonable for AmFed to obtain all relevant medical documentation before a determination was made. Thus, the earliest date that Pilate could possibly contend that the improper delay in payment began was September 14, 1995.

*398 d. September 14, 1995 through January 22, 1996.

¶ 54. The conduct during the period of September 14, 1995 through January 22, 1996 is in controversy. Two important events occurred.
¶ 55. First, pursuant to Mississippi Workers' Compensation Commission Procedural Rule 9, AmFed exercised its right to depose the claimant. AmFed attempted to expedite this process by asking to take Pilate's statement in April. The dissent claims that there was nothing that prevented AmFed from deposing Pilate sooner. Our examination looks to the entire investigation to determine whether Am-Fed's conduct was so outrageous as to allow punitive damages.
¶ 56. Here, again, there are no material facts in dispute. Certainly, AmFed could have noticed Pilate's deposition before October. Likewise, Pilate could have cooperated and allowed AmFed an opportunity to question him in April or in the months prior to October. What is important is that AmFed did ask to question Pilate, from the outset of its investigation, and expressed its intent to question him before it finalized its investigation.
¶ 57. The dissent states that it is "confounded" that the inability to question Pilate supports AmFed's contention that "it did not abdicate its responsibility to promptly investigate Pilate's claim." Certainly, a reasonable investigation includes an examination of individuals with knowledge of the issues in controversy; e.g., only Pilate would have knowledge of how his injury occurred, the injury(ies) sustained, and the medical treatment he received. It follows that AmFed would want and be entitled to examine and confront the claimant to verify his contentions, under oath and subject him to the penalty of perjury. To accept the dissent's position, would mean excusing claimants from any obligation to participate in the investigation, settlement or adjudication of their workers' compensation claim.[5]
¶ 58. Further, it was reasonable and acceptable legal strategy for AmFed to obtain all of Pilate's medical records before it scheduled the claimant's deposition. AmFed's actions were consistent with the Commission's procedural rules for litigated claims. Because Pilate's counsel refused to allow Guillory an opportunity to examine Pilate, Pilate's deposition was noticed and taken on October 6, 1995. Accordingly, any delay through October 6, 1995, cannot be considered a delay for which AmFed or Guillory was solely responsible.
¶ 59. After the deposition, on October 17, 1995, T.G. Bolen, AmFed's counsel, sent Guillory a letter that summarized Pilate's testimony. In the letter, AmFed's counsel concluded that Pilate's injury was compensable and suggested that an IME should be scheduled to determine the amount of the compensable disability. Thus, the second important event during this period was the IME of Pilate. Am-Fed exercised its right to an IME of Pilate. M.W.C.C. General Rule 9.
¶ 60. On December 6, 1995, Bolen advised Guillory that Pilate had missed the scheduled IME appointment, and it had been rescheduled. Bolen also opined that *399 Pilate's claim was worth only a few weeks of temporary total disability. Just as with the deposition, the delay in the IME cannot be considered a delay for which Am-Fed or Guillory were solely responsible.
¶ 61. After December 6th, it was reasonable for Guillory to wait for the IME. However, in January, AmFed, on advice of counsel, decided to submit the temporary total disability benefits to Pilate. Am-Fed's payment was prior to any Commission determination that such benefits were due. Pilate accepted the payment of benefits and continued with his claim for additional benefits.
¶ 62. The dissent contends that since Dr. Childress's medical records support a finding of disability and the records were received on August 17, 1995, then there is a genuine issue in dispute as to "whether AmFed had an arguable or legitimate reason to continue delaying payment to Pilate after receiving [Dr. Childress's] documents." The dissent seems to argue that the bad faith clock begins to tick as soon as there is any information available that could subsequently be considered as sufficient evidence to support the payment of temporary total disability benefits. Indeed, while hindsight affords twenty-twenty vision, neither AmFed nor Guillory had the luxury of hindsight.
¶ 63. It is undisputed that AmFed's investigation began promptly upon its notification of the claim. Without Pilate's assistance or cooperation, AmFed undertook its investigation and followed the workers' compensation laws and rules governing litigated matters. Having been invited to cooperate and assist AmFed in the prompt investigation and payment of the claim, Pilate and his counsel declined and made AmFed search for and obtain the relevant medical information that was or should have been readily available to Pilate. Pilate compelled AmFed to formally notice his deposition before he, the person with the most relevant knowledge of the claim, would tell AmFed what happened and how it had affected him.
¶ 64. AmFed, on the other hand, relied on its attorney to litigate the legal action, pending under the workers' compensation statutes and rules. AmFed's attorney's letter, dated October 17, 1995, was the first date that AmFed's attorney concluded and advised AmFed that Pilate had a compensable injury. AmFed then relied on its counsel's suggestion that an IME should be scheduled to determine the amount of the compensable disability, which was in dispute.
¶ 65. Since Pilate and the dissent suggest that we should review AmFed's conduct with the perfect vision afforded on hindsight, we must also consider Pilate's contribution to the delay. At any point, Pilate could have requested a hearing or expedited decision before an administrative law judge or the Commission to get a conclusive decision. Pilate did not! In fact, the record is devoid of any action undertaken by Pilate to assist with, cooperate in or expedite the resolution of his own claim. The dissent fails to consider how the actions of Pilate or his counsel prolonged, or contributed to the delay in, his receipt of workers' compensation benefits. Pilate's counsel apparently filed the petition when he had little knowledge about the claim, and then, counsel even refused to share what little knowledge or information he did have with AmFed or Guillory. Indeed, neither Pilate nor Turnage provided AmFed with any meaningful information throughout the investigation of the claim.
¶ 66. Pilate's expert, Robert Hershbarger, agreed that AmFed needed to take Pilate's deposition to determine all of the facts. Hershbarger testified:

*400 Q. They can also try to take a statement of him; right?
A. Right.
Q. And did they try to take a statement in this case?
A. They talked to Mr. Turnage, and he said the appropriatethe way he the preferred way was to take deposition.
Q. Okay. And as we've said, that's reasonable. And so they would need to take the deposition before they could determine all the facts; right?
A. Correct.
According to Pilate's own expert witnesses, AmFed was not in a position to pay disability benefits until October or December of 1995.
¶ 67. The duty to timely investigate and pay workers' compensation claims is a mutual obligation of both the claimant and the employer or its carrier. The employer or carrier may not ignore the duty and wait for the claimant to provide the necessary information. Also, the claimant is not excused from participation and must cooperate to assist in the resolution of the claim.
¶ 68. The discovery rules of the Mississippi Rules of Civil Procedure are applicable to litigated workers' compensation claims. M.W.C.C. Pro. R. 9. Under Mississippi Rules of Civil Procedure 33 and 34, Pilate may not excuse himself from the investigation and litigation process. Instead, Pilate was required to answer the interrogatories "fully in writing under oath" and to promptly produce the documents that were requested and not otherwise protected from discovery. Accordingly, Pilate's lack of cooperation and his reluctance to assist in expediting the payment of his own claim should, and must, be considered in determining whether AmFed or Guillory delayed the payment of benefits in bad faith.
¶ 69. The only error made by Am-Fed or Guillory was Guillory's "error" or "oversight" in waiting from mid-December until mid-January to make the payment. This one month delay was not sufficient to constitute a genuine issue of material fact in dispute. In Caldwell, a six week delay in payment was considered as merely simple negligence, which was not sufficient to reverse a summary judgment. Caldwell, 686 So.2d at 1099. There are no facts in dispute here to establish that the one month delay, which included the Christmas and New Year's holiday, was anything more than simple negligence. The dissent urges that we rely on Travelers; however, neither Pilate nor the dissent can point to any action or conduct by Pilate or his counsel to assist in the prompt determination of his claim. Pilate may not linger in the shadows and be rewarded for a short delay necessitated by a reasonable investigation conducted by the workers' compensation insurance carrier.
¶ 70. In granting the summary judgment, the circuit court properly considered the first tier of the claim and correctly concluded that AmFed's and Guillory's conduct in the delay in payment was not "misconduct of such egregious nature that punitive damages in any amount should be considered." Moeller, 707 So.2d at 1072. Granted, there may be cases where a delay of such length could possibly be sufficient grounds for a bad faith claim. This, however, is not such a case. The undisputed genuine issues of material facts present here were squarely addressed by the supreme court in Caldwell.
¶ 71. Caldwell does not establish a six week rule of thumb. Instead, Caldwell provides that an insurer's conduct does not amount to gross negligence or an intentional tort as long as the insurer is actively investigating a claim. Caldwell, 686 So.2d at 1097. AmFed's explanation of its investigation *401 was sufficient to determine that neither AmFed's nor Guillory's conduct rose to the level of gross negligence or an independent tort. There were no genuine issues of material fact in dispute to assert that AmFed's or Guillory's actions were willful, intentional, maliciously wrong or in reckless disregard of Pilate's rights.
¶ 72. For these reasons, we affirm the circuit court's summary judgment in favor of AmFed and Guillory.
¶ 73. THE JUDGMENT OF THE SUNFLOWER COUNTY CIRCUIT COURT GRANTING SUMMARY JUDGMENT TO THE APPELLEES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED AGAINST THE APPELLANTS.
McMILLIN, C.J., AND SOUTHWICK, P.J., BRIDGES, AND LEE, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., THOMAS, MYERS AND CHANDLER, JJ.
IRVING, J., dissenting.
¶ 74. Daetrus L. Pilate was injured on the job on January 21, 1995. He was not paid any workers' compensation benefits until January 22, 1996. The plurality opinion places the blame on Pilate, the injured worker, and holds that the workers' compensation insurance carrier, Federated Insurance Company (AmFed), had a justifiable reason for not paying the benefits for a whole year. Consequently, the plurality affirms the dismissal of Pilate's bad faith action against AmFed, leaving it free to visit the same misery upon the next injured worker.
¶ 75. It is my view of the facts, as presented in this record, that a genuine and material issue exists as to whether AmFed acted with gross and reckless disregard for Pilate's right to compensation. Therefore, with the appropriate respect for the view of the plurality, I am compelled to dissent. I believe that the fair and impartial dispensation of justice demands nothing less.
¶ 76. In framing the issue, the plurality first engages in a semantical game, suggesting that Pilate complains not of a denial of payment but of a delay in payment. While the plurality's observation is technically true, this technical distinction, on the specific facts of this case, is insignificant because Pilate was denied workers' compensation benefits for a whole year following his work-related injury. Whether Am-Fed was denying or delaying payment, the effect on Pilate was the same. Apparently, it would be acceptable to the plurality if AmFed had failed to pay for two or more years as long as AmFed had never emphatically said it was denying payment. The important fact is that the payment was not forthcoming, not being tendered until one year had elapsed from the date of the injury. Should AmFed be given brownie points because it paid one year after the injury when the law requires payment within fourteen days following notice of the injury by the employer? Miss.Code Ann. § 71-3-37(2) (Rev.2000). I think not. It is not disputed here that International Plastics Corporation (IPC), Pilate's employer, had notice of the injury on or about January 23, 1995, two days following the injury.
¶ 77. The central issue here is whether there is a genuine issue as to whether AmFed had a legitimate or arguable reason for refusing to pay the claim for one full year following Pilate's injury. The plurality accepts AmFed's argument that it was justified in not making the payment until one year later because it was attempting to "obtain sufficient information to determine Pilate's incapacity to work *402 and the extent thereof." However, the plurality does not explain the basis for extending the justification for not paying approximately five months after receiving sufficient medical records to make a determination regarding disability. It is not disputed in this record that AmFed received Dr. Childress's medical records on August 17, 1995, and Dr. Brown's on September 14, 1995, yet no disability payments were made until January 22, 1996.
¶ 78. The plurality clearly errs in affirming the circuit court's finding that no genuine issues of material fact exist as to whether AmFed and Guillory committed a willful or malicious wrong or acted with gross and reckless disregard for his contractual and statutory rights to timely pay workers' compensation benefits to Pilate. I agree with Pilate:
There are jury questions present as to whether appellees acted promptly, adequately and as to whether an arguable or legitimate basis for delaying the payment of Pilate's worker's compensation claim from January 21, 1995 to January 1996, as to whether appellees committed a willful or malicious wrong, or acted with gross and reckless disregard for Pilate's contractual and statutory rights for worker's compensation benefits, and as to whether appellees made a prompt and adequate investigation to obtain all medical information relevant to Pilate's worker's compensation claim.
¶ 79. In determining what type of misconduct will justify any award of punitive damages our supreme court has said that "if an insurer has a legitimate or an arguable reason for failing to pay a claim, punitive damages will generally not lie." Moeller v. Am. Guar. and Liab. Ins., 707 So.2d 1062, 1072 (Miss.1996) (citing Standard Life Ins. Co. of Ind. v. Veal, 354 So.2d 239, 248 (Miss.1977)). In other words, if the insurer possessed a legitimate or arguable reason for not paying a claim, the insurer is deemed to have acted in good faith. On the other hand, if the insurer did not have a legitimate or arguable basis for not paying the claim and acted with willful, malicious, gross negligence, or reckless disregard for the rights of the claimant, then punitive damages will lie.
¶ 80. It is important to ascertain exactly when AmFed possessed sufficient medical information to make a determination that Pilate was entitled to at least temporary total disability benefits.
¶ 81. In deposition testimony, which was offered by Pilate in opposition to Am-Fed's motion for summary judgment, expert witness Bill Dumbauld gave his opinion as to when temporary total disability compensation should have been made to Pilate. While he could not verify exactly when AmFed received sufficient medical documentation to support a finding of disability, Dumbauld gave the following testimony:
Q: (Counsel for AmFed): Other than saying that AmFed failed to work with the insurer to get this claim reported, you can't sit here today and tell us when AmFed should have begun paying this claim?
A: (Dumbauld): I think they should have made payments as quickly as they could after April 27th.
Q: Okay. And as quickly as they could would be when they would get the medical documentation to support it, right?
A: Yes.
¶ 82. Moreover, Robert Hershbarger, another expert witness, gave a more exact opinion as to the appropriate time for Am-Fed to have made payments:
Q: (Counsel for AmFed): Okay. Let's go to this question right here. We *403 agree that you don't have to pay disability or compensation until the disability is established; correct?
A: (Hershbarger): Correct.
Q: The disability is established once you have medical supportsthe inability to earnthe claimant has the inability to earn wages supported by medical records?
A: Correct.
Q: When did (AmFed) get medical records sufficient to establish a disability?
A: According to the records, it was on August 1 from Dr. Gough and Dr. Brown[6] and August 14th from Dr. Childress they had the medical records.
Q: Okay.
A: Now, that's what the casethat's what the case and claims list shows, but in my opinion they should have had these records earlier. If they had been aggressive and worked the case with the doctors and the attorney in the deposition, they could have gotten those earlier.
¶ 83. After giving this testimony, Hershbarger directed both counsel's attention specifically to the medical records of Dr. Childress's office as being sufficient evidence to support temporary total disability compensation for the aforementioned period.
¶ 84. Assuming that Hershbarger's testimonythat Dr. Childress's medical records support a finding of disability and that Guillory received those records on August 17, 1995is true, the question becomes whether AmFed had an arguable or legitimate reason to continue delaying payment to Pilate after receiving those documents.
¶ 85. "Arguably-based denials are generally defined as those which were rendered upon dealing with the disputed claim fairly and in good faith." Moeller, 707 So.2d at 1072. Therefore, in order for Pilate to prevail, he was obligated to demonstrate that the level of negligence was such that if a proper investigation had been conducted, it would have easily revealed evidence that would have demonstrated that AmFed's defenses were without merit. Murphree v. Fed. Ins. Co., 707 So.2d 523, 531 (Miss.1997).
¶ 86. The plurality makes the following observations, apparently in support of its conclusion that AmFed conducted a good-faith investigation:
(a) AmFed never denied Pilate's claim, (b) AmFed paid Pilate's claim for temporary total disability benefits, (c) after receiving notice of the claim, AmFed complied with the workers' compensation statutes and rules governing litigated claims, (d) Pilate and his counsel failed to cooperate with AmFed by not providing complete medical information, (e) Pilate failed to cooperate with Am-Fed by refusing AmFed's request to submit to an oral examination in April, (f) Pilate's deposition was taken in October, (g) Pilate missed his scheduled independent medical examination (IME), and (h) Pilate took no action to bring this matter before the Commission until after the temporary total disability benefits were paid.
Plurality opinion at (¶36).
¶ 87. I respond to the points made by the plurality in the order listed. First, we do not have the benefit of the Workers' *404 Compensation Commission file. It was not submitted as an exhibit in the proceedings before the trial court. Therefore, we are not entirely informed of AmFed's actions in the workers' compensation case that gave rise to this bad faith action. However, it is a fact that AmFed did not pay any benefits until one year after Pilate's injury.
¶ 88. Second, it is not accurate, as the plurality contends, that after receiving notice of the claim, AmFed complied with the workers' compensation statutes and rules governing litigated claims. The rules and statute require payment within fourteen days of notice. It is not disputed that IPC had notice in January 1995, and AmFed in April 1995, yet payment was not made until nine months following notice to Am-Fed. Additionally, as discussed later in this opinion, the Commission's procedural rules require discovery to be completed within 120 days of notice from the Commission of a controverted claim. That was not done by AmFed.
¶ 89. Third, as to the plurality's assertion that Pilate and his counsel failed to cooperate with AmFed by not providing complete medical information, I note that once AmFed got the information from Dr. Childress and Dr. Brown, it still refused to pay. Therefore, it stands to reason that the delay, if any, occasioned by Pilate's tardiness in producing medical information was of no moment in AmFed's decision not to pay timely. Further, AmFed knew that its obligation to vigorously investigate the claim extended beyond simply asking Pilate, the claimant, for medical records. That understanding is revealed via the following colloquy occurring in the deposition testimony of AmFed's agent, Mark Guillory:
Q: (Attorney for Pilate): If [a medical] release was not forthcoming, then what would be the procedure to get the medical records?
A: (Guillory): I would imagine whatever legal means the defense attorney felt he had to take in order to get the records.
Q: Well, I guess what I'm asking you is, at AmFed it would be your duty and responsibility to investigate the claim, right?
A: That's correct.
Q: No question about that?
A: Do everything I can.
Notwithstanding Guillory's testimony that he was required to do everything he could to get the medical records and information, he did nothing substantially. Neither he nor AmFed scheduled any medical depositions even though under the Commission's rules medical depositions should have been scheduled within 120 days of AmFed's being notified of the claim. Surely, conducting a medical deposition would have been an easy way to obtain the medical information which AmFed contends it so desperately needed.
¶ 90. Fourth, as to the plurality's assertion that Pilate refused to submit to an oral examination in April, I ask, "why did AmFed not depose or seek to depose Pilate until October, 1995?" In April, Pilate did not refuse to give a deposition; he simply refused to give an oral statement. He offered to give a deposition, but Am-Fed did not take him up on his offer until October. I do not equate a refusal to give a statement, while willing to give a deposition, with being uncooperative. Procedural Rule 7 of the Workers' Compensation Commission provides in pertinent part that:
When the claim is controverted and an answer filed, the case shall be immediately assigned to an administrative judge and placed on the active docket. Discovery shall be completed and medical depositions scheduled within 120 *405 days from the date of notice from the Commission that the case has been placed on the active docket.
M.W.C.C. Pro. R. 7. Pilate, receiving no payments for four months, controverted the claim in April 1995. Under the Commission's rule, the case was placed on the active docket, triggering the requirement that discovery be completed within 120 days from the date of notice from the Commission. AmFed received notice from the Commission on or about April 25, 1995. Therefore, discovery was required to be completed no later than August 25, 1995. This record reflects that AmFed did not schedule Pilate's deposition until October 17, 1995, well beyond the period when, according to the Commission's rule, the deposition should have been scheduled in a controverted case.
¶ 91. Fifth, as to the plurality's assertion that Pilate missed his IME, the facts suggest that Pilate's missing the IME was irrelevant to AmFed's delayed-payment decision. This point is borne out by the fact that the IME was not even scheduled until on or about November 15, 1995. There is nothing in the record which remotely suggests that Pilate or his counsel impeded the scheduling of the IME. Furthermore, based on the late scheduling of the IME, it is not reasonably arguable that Pilate's failure to keep the appointment played any role in AmFed's delay in making payment, for it had already refused to pay for almost eleven months before it scheduled the IME.
¶ 92. Finally, the plurality faults Pilate for taking no action to bring his claim on for hearing before the Commission. In other words, in the view of the plurality, notwithstanding AmFed's statutory obligation to promptly investigate and pay workers' claims, it is okay for AmFed to shirk with impunity its obligation to the injured worker if the injured worker, who has no funds, fails to aggressively pursue his claim before the Commission. Nothing in our jurisprudence supports the plurality's broad reach for support.
¶ 93. As I view the record, AmFed's first defensive posture was that it could not pay the claim because it had no medical records upon which to make a determination. Once it got the medical records, this excuse was no longer viable, so it had to come up with something else. Then it contended that the records were insufficient to make a determination regarding the extent of disability. The excuses would appear more credible if AmFed, upon receiving the medical records, had written the physicians or deposed them to obtain clarification. It did neither as Guillory freely admitted:
Q: You had determined that it was compensable, but you just didn't have enough information about the dates that he was temporarily totally disabled.
A: That's correct.
Q: Right?
A: Uh-huh.
Q: What I'm asking you is, at any point in time after you received the medical records from those three doctors, did you sit down and write a detailed letter saying, "Doctor, tell me what dates this gentleman was temporary totally disabled from the January 21, '95 back injury"?
A: No, because I didn't have to.
Q: Why not?
A: Well, some of those records already had mention of disability in them. It was light duty, however, and the insured could provide light duty. So there was no issueno reason to write a letter to the physician.
It seems to me if there was no reason to write for clarification, there was no reason *406 to continue to refuse to make payments. The significance of Guillory's admission here should not be overlooked. The testimony quoted above proves that in August 1995, when AmFed received Dr. Childress's medical records, it knew from the records that Pilate had suffered a work-related disability, yet compensation payments were not forthcoming. Further, notwithstanding AmFed's attempt to parcel its reasonno medical records and insufficient medical recordsfor not paying Pilate's claim, neither it nor the plurality offers any acceptable explanation for Am-Fed's failure to pay by more than a month after it, by its own admission, had determined the extent of Pilate's disability. The only explanation in the record is the one offered by Guillory when he testified that it was an oversight on his part:
Q: Was there ever a period a temporary total disability that was established for Daetrus Pilate?
A: Clearly?
Q: Or that was at least sufficient to cause a payment to be generated.
A: Yes.
Q: Who made that determination?
A: A combination of myself and T.G. Bolen.
Q: When was that decision made?
A: Around about December the 19th, 18th or 19th, something like that.
Q: Where is that documented?
A: If you will reflect on January 19, Mr. Bolen had called me and wanted to know if the claim, the amount of compensation that we had determined, had been paid, and I erroneously, as an oversight on my part, did not make the payment; and as of that date, the check was issued.
Q: On January 19 of '96?
A: Yes, sir.
¶ 94. Pilate's expert witness, Hershbarger, testified that AmFed had sufficient information to support Pilate's disability when Guillory received Pilate's medical records from Dr. Childress. I am confounded by the plurality's assertion that the lack of a statement from Pilate and his missing the scheduled IME somehow supports AmFed's contention that it did not abdicate its responsibility to promptly investigate Pilate's claim or that no issue exists as to whether AmFed's conduct amounts to a reckless disregard of Pilate's rights.
¶ 95. Hershbarger testified that the following aspects of AmFed's investigation and belated payment of Pilate's claim were indicia of bad faith: (1) AmFed's failure to instruct and train its insureds to promptly report workers' compensation claims, (2) the fact that Pilate had to initiate action concerning his claim by filing a petition to controvert, (3) AmFed's failure to interview eyewitnesses of Pilate's injury, (4) AmFed's failure to interview or obtain a detailed statement from the individuals involved in the claim (i.e., Fair and Griffin), (5) AmFed's failure to conduct Pilate's deposition before it filed its answer to Pilate's petition to controvert, (6) AmFed's failure to obtain Pilate's medical records in a timely manner, (7) AmFed's failure to pay workers' compensation benefits to Pilate by August when it possessed adequate medical records, particularly through those of Dr. Childress, to support payment, (8) AmFed's failure to maintain an accurate and complete claim listing record, (9) Am-Fed's failure to follow its procedural guidelines in processing Pilate's claim, (10) Guillory's failure to properly document all file activity, (11) Guillory's failure to ask Drs. Brown, Childress, or Gough whether Pilate had any temporary total disability arising out of his January 21, 1995 injury, (12) AmFed's failure to pay all medical bills accruing from Pilate's claim, and (13) AmFed's *407 failure to provide adequate supervisory review of Pilate's claim.
¶ 96. Moreover, as explained earlier, Guillory sat idle and failed to make temporary total disability payments to Pilate for over a month after he and AmFed had agreed on the period of temporary total disability.
¶ 97. The law in Mississippi places a duty on an insurance company to promptly and adequately investigate all of the relevant facts involved in an insured's claims. Szumigala v. Nationwide Mut. Ins. Co., 853 F.2d 274, 280 (5th Cir.1988); see also Bankers Life & Cas. Co. v. Crenshaw, 483 So.2d 254, 276 (Miss.1985). Moreover, Mississippi Code Annotated section 71-3-37 (Rev.2000) states, "Compensation under this chapter shall be paid periodically, promptly, in the usual manner, and directly to the person entitled thereto, without an award except where liability to pay compensation is controverted by the employer."
¶ 98. The plurality, relying upon Caldwell and two events which occurred in the fourth quarter of the year in which AmFed refused to pay the claim, argues that Am-Fed's year's delay in paying Pilate's claim was acceptable notwithstanding the undeniable fact that AmFed had sufficient information, at least five months prior to paying the claim, to make a determination about the extent of temporary total disability benefits. I have already discussed the inconsequential effect of the two events. In the paragraphs that follow, I discuss why I believe the plurality's reliance on Caldwell is not well grounded.
¶ 99. First, Caldwell is not factually comparable to the case at bar. In Caldwell, Keith Caldwell was killed in an automobile accident on October 20, 1990. The insurance company was notified of the accident on February 15, 1991. Caldwell, 686 So.2d at 1093. On April 1, 1991, Abb Caldwell, Jr., Keith's father, who was also the administrator of Keith's estate, filed suit against Abb's insurance company for medical and uninsured motorist benefits after the insurance company did not pay the benefits by Abb's self-imposed deadline of April 1, 1991. Id. The insurance continued to investigate the accident and on May 28, 1991, tendered payment. Id. at 1094. Understandably, the Mississippi Supreme Court held that:
After review of the record, this Court concludes that the trial court properly granted summary judgment on the issue of punitive damages. The linchpin here is that Alfa never denied the claim, but rather continued its investigation until all concerns had been resolved. The claim was paid six weeks after Caldwell's imposed deadline. We do not find that time frame to be unreasonable given the explanation in this record. We caution, however, against failure to pay claims where liability and coverage is clear and where the time frames are of greater length, such as in Travelers.[7] This would be applicable even more so where coverage is denied.
Id. at 1099.
¶ 100. Clearly, there is no comparison between paying a claim within three months of notification of the claim, as did the insurance company in Caldwell, and delaying the payment of a claim for nine months after notification as did AmFed in the case before us. The facts of our case are much more analogous to the facts in Travelers than to the facts in Caldwell.
¶ 101. In Travelers, the Mississippi Supreme Court affirmed a punitive damages instruction where the insurer withheld offer of payment for a period of eight *408 months. Travelers, 368 So.2d at 834. A brief review of the salient facts in Travelers is helpful.
¶ 102. Carl and Lula Bell Wetherbee's dwelling was insured by Travelers Indemnity Company. On February 14, 1976, the dwelling was severely damage by fire. Id. at 830. The fire was reported to Travelers three days later. Id. Travelers immediately began its investigation. However, during the course of the investigation, the fire marshal advised Travelers that Wetherbee (presumably Carl) was a prime suspect in the cause of the fire. Id. Travelers's claim representative advised the Wetherbees of the fire marshal's report, and Travelers declined payment to the Wetherbees during the course of the fire marshal's investigation. Id. On May 25, 1976, the fire marshal issued a report exonerating the Wetherbees, but Travelers still refused to make payment. Id. at 831. Instead, Travelers began negotiations to try and settle the damage claim, using an estimate it had acquired in the interval. Id. at 833. The negotiations were not successful, and the Wetherbees finally filed a lawsuit on December 21, 1976. Id. Travelers tendered the contents payment on February 4, 1977. Id. at 834.
¶ 103. In upholding the trial court's decision regarding punitive damages, the Travelers court stated:
[W]e are of the opinion the punitive damage instruction was properly granted. The primary reason for this conclusion is the delay reflected in the evidence.... Granting reasonableness to Travelers in withholding all payments during the arson investigation, nevertheless this terminated on May 25, 1976, and the contents payment was not tendered until February 4, 1977, ... when Travelers had certain knowledge of the loss and repeated demands for payment had been made.
Id. at 834-35.
¶ 104. Based upon my exhaustive review of the record, I find that an issue of material fact exists as to whether AmFed and Guillory's continuing denial of Pilate's claim, upon their receipt of medical records from Dr. Childress on August 17, 1995, constituted a willful, intentional, malicious wrong or a reckless disregard of Pilate's rights. Therefore, I find that Pilate has presented sufficient facts to overcome AmFed's motion for summary judgment. Accordingly, I dissent from the plurality's affirmance of the trial court's order granting summary judgment. I would reverse and remand this case for a trial on the merits.
KING, P.J., THOMAS, MYERS AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Guillory's claim notes began on April 28, 1995. Guillory's notes confirms that AmFed first received notice of Pilate's petition on April 24, 1995 and his assignment began on April 27, 1995.
[2] The IME was rescheduled for March 11, 1996.
[3] The dissent contends that we engage in a "semantical game, suggesting that Pilate complains not of a denial of payment but of a delay in payment." Such is simply not true. First, we look to Pilate's own words, quoted in paragraph 21 above and in paragraph 5 of the dissent, where he characterizes his claim as a bad faith delay in payment of claim. Second, as discussed in further detail below, the Mississippi Supreme Court determined that there is a significant difference between an insurance company's decision to deny a claim versus a delay in payment, during the reasonable investigation of the claim. Caldwell v. Alfa Ins. Co., 686 So.2d 1092, 1098 (Miss.1996). The decision to deny was described as the "linchpin" of whether a claim for punitive damages could be submitted to the jury. Id. Indeed, the difference is significant.
[4] Guillory was employed by AmFed as a claims adjuster. Although Guillory's name appears throughout Pilate's pleadings and briefs, there appears no basis or explanation of the claims or allegations to support a finding that Guillory was or could be personally liable for his actions as an agent or employee of AmFed. Since this issue was not raised before the circuit court or in this appeal, we do not address it here.
[5] Indeed, the dissent imposes no responsibility or obligation on the claimant. Accepting this view, workers' compensation claimants would have no reason to cooperate in the resolution of their claim. Indeed, their refusal to cooperate or intentional interference with the investigation could provide a subsequent reward through a viable bad faith claim. Such a holding would undermine the fundamental principle of construing the procedural rules "to secure the just, speedy, and inexpensive determination of every action." M.R.C.P. 1.
[6] The record evidence shows that Guillory actually received Dr. Brown's medical records on September 14, 1995.
[7] Travelers Indem. Co. v. Wetherbee, 368 So.2d 829 (Miss.1979).