# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 21, 2013

No. 11-60458

Lyle W. Cayce
Clerk

FAITH JAMES,

Plaintiff - Appellant,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

Defendant - Appellee.

Appeals from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, and GARZA and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendant-Appellee State Farm Mutual Automobile Insurance Co. ("State Farm") tendered the policy limit on its uninsured motor vehicle coverage to Plaintiff-Appellant Faith James nearly thirty months after James was injured in a car accident. James brought a bad faith claim under Mississippi law, and the district court granted State Farm's motion for summary judgment. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.

## I. BACKGROUND

### A. Facts

On February 3, 2006, James was involved in a car accident with Jarvis Smith. The parties do not dispute that Smith's negligence was the sole cause of

the accident. James's vehicle turned over at least once, and she was taken from the scene in an ambulance to Wayne General Hospital. James received numerous stitches for a head wound and testified in her deposition that she felt significant pain in her chest, back, and head immediately after the accident.

At the time of the accident, James and/or her husband owned four State Farm insurance policies. The policy on the vehicle James was driving at the time of the accident included $5,000 in medical payments coverage, collision coverage, and $10,000 per person in uninsured/underinsured motor vehicle ("UM") coverage. Each of the other three policies also provided $10,000 per person UM coverage for a stacked total of $40,000 in UM benefits. The parties do not dispute that James's policies were in effect at the time of the accident. After James promptly notified State Farm of the accident, State Farm quickly paid out under its medical payments and collision coverage.

At issue is State Farm's delay in paying James benefits under her UM coverage. As the timeline of events contained in the record underpins our analysis of James's claims, we refrain from a lengthy factual recitation here and instead present critical events in our below discussion. We now continue our summary of this case's background with an overview of its procedural history.

## B. Procedural History

On October 23, 2007, James and her husband[1] filed a complaint against State Farm in federal district court on diversity grounds. On February 13, 2008, James filed an amended complaint, which alleged that State Farm was intentionally engaging in delaying tactics to avoid paying on the policies. Because of this delay, the complaint alleged that State Farm had, *inter alia*, committed the tort of bad faith.[2] The complaint requested a jury trial and

---

[1] James's husband later voluntarily dismissed his complaint.

[2] James also asserted that State Farm's actions were "a breach of Defendant's duties of good faith and fair dealings and duty to fairly and promptly adjust claims under the

2

No. 11-60458

sought $40,000 due under the policy, compensatory damages, and punitive damages.

Over the next several months, the magistrate judge granted two motions to compel against State Farm. On July 29, 2008, State Farm paid its stacked UM policy limit of $40,000 to James. State Farm then filed a motion for summary judgment on October 29, 2008. On May 6, 2011, the district court granted State Farm's motion for summary judgment, entered final judgment in favor of State Farm, and dismissed the complaint with prejudice. No. 4:07-CV-137, 2011 WL 1743421 (S.D. Miss. May 6, 2011). This appeal followed.[3]

## II. DISCUSSION

On appeal, James makes two arguments related to her bad faith claim: (1) State Farm withheld payment under one policy in order to coerce a lower settlement for claims under other policies, and (2) State Farm unreasonably delayed payment on the claim without a legitimate or arguable basis for doing so.

## A. Standard of Review

We review a district court's grant of summary judgment de novo. *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 516 (5th Cir. 2010) (citation omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material

---

Plaintiffs' policy." Even if the pleadings indicate James may have asserted these as claims separate from her bad faith claim, James has pressed only her bad faith claim on appeal.

[3] On appeal, James appears to assert a separate breach of contract claim. The district court apparently interpreted this claim as a sub-issue within James's bad faith claim. On appeal, James combines this claim with her argument as to the independent tort of bad faith. Assuming *arguendo* that James intended to assert a breach of contract claim separate from her bad faith claim, we hold this claim to have been waived on appeal because James points to no policy provisions supporting this claim. *See* Fed. R. App. P. 28. Accordingly, we affirm the district court to the extent that it granted summary judgment to State Farm on a breach of contract claim.

3

fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view all facts and evidence in the light most favorable to the non-movant, here James. *Bradley*, 620 F.3d at 516 (citation omitted). When a defendant moves for summary judgment and identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial, then the defendant is entitled to summary judgment unless the plaintiff is able to produce "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Kovacic v. Villarreal*, 628 F.3d 209, 212 (5th Cir. 2010) (citations omitted) (quoting *Thompson v. Upshur Cnty, Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). "[T]he propriety of summary judgment [is] bound up in the burdens of proof at trial . . . ." Steven Alan Childress & Martha S. Davis, 1 *Federal Standards of Review* § 5.02, at 5-26 (4th ed. 2010) (citing *Anderson*, 447 U.S. at 247-48, 254).

We review the district court's interpretation of state law de novo, and we "give no deference to its determinations of state law issues." *Bradley*, 620 F.3d at 516 (citation omitted).

**B. Applicable Law**

Because James brought this case in federal court on diversity grounds, Mississippi substantive law applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). "To determine issues of state law, we look to final decisions of the state's highest court, and when there is no ruling by that court, then we have the duty to determine as best we can what the state's highest court would decide." *Westlake Petrochems., L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238 n.5 (5th Cir. 2012) (citation omitted). "In making an [*Erie*] guess in the absence of a ruling from the state's highest court, this Court may look to the decisions of

No. 11-60458

intermediate appellate state courts for guidance." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (citation omitted).

### 1. Claim against insurer for bad faith

James asserts that State Farm committed the tort of bad faith when it delayed payment on her UM claim. "[A] bad faith refusal claim is an 'independent tort' separable in both law and fact from the contract claim asserted by an insured under the terms of the policy." *Spansel v. State Farm Fire & Cas. Co.*, 683 F. Supp. 2d 444, 447 (S.D. Miss. 2010) (alteration in original) (quoting *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 895 (Miss. 2006)).

The Mississippi Supreme Court has recognized that claimants can bring bad faith claims against and recover punitive damages from insurers who refuse to pay out on a valid claim. *See Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1098 (Miss. 1996) (holding that denial of a valid insurance claim is critical for the submission of punitive damages to a jury). Additionally, although Mississippi courts are skeptical of such claims, they have permitted claimants to recover damages on bad faith claims when resolution of an insurance claim is merely delayed rather than ultimately denied.[4] *See, e.g., Travelers Indem. Co. v. Wetherbee*, 368 So. 2d 829, 834-35 (Miss. 1979) (affirming jury award for punitive damages where insurer withheld payment for eight months); *AmFed Cos., LLC v. Jordan*, 34 So. 3d 1177, 1191 (Miss. Ct. App. 2009) (affirming trial judge's decision to submit punitive damages issue to the jury in a delay-of-payment case); *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 400 (Miss. Ct. App. 2004) ("[T]here may be cases where a delay [of payment for one month] could possibly be sufficient grounds for a bad faith claim."); *see also Essinger v. Liberty Mut.*

---

[4] Thus, here, we treat caselaw that refers to a "denial of a claim" as interchangeable with a "delay of payment on a claim" unless the context indicates that the law pertains specifically to a denial.

No. 11-60458

*Fire Ins. Co.*, 529 F.3d 264, 271 n.1 (5th Cir. 2008) (citation omitted) ("Inordinate delays in processing claims and a failure to make a meaningful investigation have combined to create a jury question on bad faith."); *but see Tutor v. Ranger Ins. Co.*, 804 F.2d 1395, 1399 (5th Cir. 1986) (per curiam) (reversing jury's punitive damage award where payment was delayed during an ongoing dispute between insured and insurer); *Caldwell*, 686 So. 2d at 1098 (affirming grant of summary judgment where insurance company delayed payment for three months in complex wrongful death claim, including a six-week delay after it completed its investigation).

Our review of the case law illustrates that whether to submit a delay-of-payment claim to a jury is a highly fact-sensitive analysis.

### 2. *Compensatory and punitive damages*

James seeks to recover compensatory and punitive damages for State Farm's payment delay. In Mississippi, compensatory[5] and punitive damages are related. To establish a claim for punitive damages in the context of a bad faith claim, a party must first establish her entitlement to compensatory damages. *See Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008) ("Mississippi law does not permit parties to recover punitive damages unless they first prove that they are entitled to compensatory damages." (citations omitted)). To do so, the trial judge must decide, as a matter of law, that the insurer lacked 'a reasonably arguable basis' for denying the claim." *See id.* at 628 (citation omitted) (quoting *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1186 n.13 (Miss. 1990); *U.S. Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 492 (5th Cir. 1992) (citation omitted); *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 288 (Miss. 2012) ("When an insurer denies a claim without an arguable basis . . . extracontractual damages may provide [a] form of relief."

---

[5] For purposes of this appeal, we use compensatory damages interchangeably with consequential and extra-contractual damages.

6

No. 11-60458

(footnote omitted)).  Then, the trier of fact determines whether compensatory damages are to be awarded and in what amount.  Miss. Code Ann. § 11-1-65(1)(b) (West 2012).  If and only if the trier of fact does award compensatory damages, then "the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact."  *Id.* § 11-1-65(c); *see also Jordan*, 34 So. 3d at 1189 (describing process whereby after the jury awarded the claimant compensatory damages, the claimant moved to submit the issue of punitive damages to the jury).

Moreover, an insurer can be held liable for compensatory damages without simultaneously being held liable for punitive damages.  *See Broussard*, 523 F.3d at 628 ("Insurers who are not liable for punitive damages may nonetheless be liable for consequential or extra-contractual damages (*e.g.,* reasonable attorney fees, court costs, and other economic losses) where their decision to deny the insured's claim is without a reasonably arguable basis but does not otherwise rise to the level of an independent tort." (citations and internal quotation marks omitted)).   Extra-contractual damages also include emotional distress, inconvenience, and accounting fees.  *Spansel*, 683 F. Supp. 2d at 448 (collecting Mississippi Supreme Court citations).

Because whether the insurer "lacked 'a reasonably arguable basis' for denying the claim" is a threshold issue for a punitive damages claim, if a court decides as a matter of law that the insurer does have an arguable or legitimate basis for its denial, the plaintiff is entitled to neither compensatory nor punitive damages.  If, however, a court determines as a matter of law that the insurer lacks such a basis, the trier of fact must determine whether to award compensatory damages before the court can determine whether the trier of fact may also consider punitive damages.  Thus, if an appellate court determines that an insurer lacks an arguable or legitimate basis, then the court must remand to

the district court for trial on compensatory damages and cannot simultaneously determine whether punitive damages are warranted.

### 3. Arguable or legitimate basis

As noted above, whether an insurer possessed an arguable or legitimate reason is a question of law. *Wigginton*, 964 F.2d at 492 (citation omitted); *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232-33 (Miss. 2001). "Arguable reason is defined as nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to [the] heightened level of an independent tort." *Caldwell*, 686 So. 2d at 1096 (citation and internal quotation marks omitted). The initial burden placed on the insurer is low: it "need only show that it had reasonable justifications, either in fact or in law" for its actions. *Wigginton*, 964 F.2d at 492 (citation omitted). Once an insurance company articulates an arguable or legitimate reason for its payment delay, the insured bears the burden of demonstrating that the insurer had no arguable reason. *Caldwell*, 686 So. 2d at 1097. "The plaintiff's burden in this respect likewise exists at the summary judgment stage where the insurance company presents an adequate prima facie showing of a reasonably arguable basis for denial so as to preclude punitive damages." *Id.* at 1097 n.1 (citation omitted).

Whether a claimant has proven an insurer acted without a reasonable or arguable basis is determined by a preponderance of the evidence. *See, e.g.*, *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 484 (Miss. 2002) (approving of jury instructions that used preponderance of the evidence standard); *Mut. Life Ins. Co. of N.Y. v. Estate of Wesson*, 517 So. 2d 521, 530 (Miss. 1987), *abrogated on other grounds by Gen. Am. Life Ins. Co. v. McCraw*, 963 So. 2d 1111, 1114 (Miss. 2007) (same).[6]

---

[6] State Farm argues that James must establish the lack of an arguable or legitimate basis by clear and convincing evidence. While it is clear that the second part of the punitive damages test under *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So. 2d 637, 641 (Miss.

No. 11-60458

### *4. Insurer duties under Mississippi law*

Mississippi places a duty on insurers to properly investigate the claims asserted by their insured.  Specifically, "[u]nder Mississippi law, insurers have a duty 'to perform a prompt and adequate investigation and make a reasonable, good faith decision based on that investigation' . . . ."  *Broussard*, 523 F.3d at 627-28 (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 535 (Miss. 2003)).  "A proper investigation means obtaining 'all medical information relevant to a policyholder's claim.'" *McLendon v. Wal-Mart Stores, Inc.*, 521 F. Supp. 2d 561, 565 (S.D. Miss. 2007) (quoting *Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994)).  To do so, an insurer must "make a reasonable effort to secure all medical records relevant to the claim." *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 204 (Miss. 2002) (citation and internal quotation marks omitted).

### C. Analysis

Having set up the legal background to James's bad faith claim, we now proceed to determine whether State Farm has an arguable or legitimate basis for delaying payment on James's claim.[7]  The parties have framed the analysis of this issue as an all-or-nothing proposition. State Farm delayed payment from February 2006, when James reported the accident to State Farm, until July 29,

---

1998), does require clear and convincing evidence, *see* Miss. Code Ann. § 11-1-65, State Farm has identified no Mississippi court that has squarely addressed the question of whether establishing the lack of an arguable basis requires a similarly heightened standard.  Moreover, the plain language of the Mississippi statute limits its heightened standard to proof of "actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or . . . actual fraud."  Miss. Code Ann. § 11-1-65(1)(a).  This plainly addresses the second part of the punitive damages test, not the threshold issue that we consider today.  Therefore, as State Farm has presented no contrary authority, we hold that the lack of an arguable or legitimate basis requires only proof by a preponderance of the evidence.

[7] James also argues that State Farm withheld payment under one policy in order to coerce a lower settlement for claims under other policies.  She concedes that she has no evidence to support this contention, and so she has waived this argument on appeal.  *See* Fed. R. App. P. 28(a)(9)(A).

2008, when State Farm tendered payment. James argues State Farm had no arguable or legitimate basis for the entirety of this thirty month delay. According to State Farm, it reasonably delayed payment during the entire thirty-month period because it "was actively investigating the claim and attempting to resolve the relevant issues," namely, the cause of James's injuries.

We agree that conducting a prompt and adequate investigation provides a legitimate basis for a payment delay. *See Caldwell*, 686 So. 2d at 1098. Therefore, to properly determine whether State Farm reasonably delayed payment, we need to analyze the record to understand when State Farm was actively investigating James's claim and thus had a legitimate basis for its payment delay. The record shows the following: (1) State Farm was actively investigating James's claim for about seventeen months of the thirty-month period and (2) State Farm had no arguable or legitimate basis for about thirteen months of the delay.

### 1. Legitimate Basis for Delay: February-May 30, 2006 (~4 months)

State Farm argues it had a legitimate or arguable basis for delay from February through May 30, 2006 because it was attempting to determine whether Smith, the accident's tortfeasor, was insured. We agree that State Farm was conducting a prompt and adequate investigation during this time period.

James promptly notified State Farm of the accident in early February, and State Farm immediately began communicating with James about her collision and medical payments coverage. At the same time, State Farm was investigating whether Smith or the owner of the vehicle he was driving at the time of the accident had insurance coverage. If they had adequate insurance coverage, James's UM coverage would not apply. During this period of time, State Farm's claim representative attempted to reach Progressive, Smith's former insurance company, multiple times, and left numerous voicemail messages for a Progressive contact who never returned State Farm's calls. On

No. 11-60458

May 30, 2006, State Farm confirmed that Progressive had denied coverage, triggering State Farm's UM coverage for accident-related injuries.

The record thus shows that State Farm had a legitimate basis for failing to tender payment from February through May 30, 2006 as it was actively investigating whether James was covered by her policy's UM benefits.

### 2. *Legitimate Basis for Delay: May 31, 2006-July 20, 2006 (~6 weeks)*

State Farm argues its active investigation of James's claim provides a legitimate or arguable basis for its delay. We agree with this contention for the time period lasting from May 31 through July 20, 2006.

The record shows that State Farm received James's signed medical authorization form, authorizing State Farm to obtain James's medical records, on February 20, 2006. Thereafter, James continued to experience significant back pain for which she sought treatment. On May 8, 2006, she began seeing Dr. Ken Staggs at the Pain Treatment Center.

On June 5, 2006, State Farm requested James's medical records and bills from three medical facilities. James continued to apprise State Farm of her on-going medical treatment for which State Farm continued to promptly request medical records and bills. On June 21, 2006, State Farm received medical records from the Pain Treatment Center. The records stated that James had "compression fractures at T2, T3, T5 and T11 all ensuing from a motor vehicle accident presumed February 03, 2006 as there is edema on the MRI indicating that these are new." Soon after, Renee Powell, the State Farm claim representative recently assigned to James's file, noted that she had received the Pain Treatment Center records and reported that they diagnosed James as having "traumatic multi-thoracic compression fractures w/out retropulsion, T7-8 HNP w/o myelopathy or radiculopathy . . . ." Powell also observed the records listed past medical and surgical treatment James had received, and she specifically noted that the list did not include any spinal surgery. On July 18,

11

2006, Powell repeated her earlier entry about James's diagnosis and further stated that "[i]f records do not show any more evidence of pre-existing issues, it seems that the medical records are supporting that [James's] problems are a result of the [motor vehicle accident]."

On July 20, 2006, Powell noted in James's file, "Records from Wayne General indicate some degenerative changes in thoracic vertebrae with compression, but apparently the condition had not been causing any symptoms prior to loss, but I will review material closely as rec'd [sic]."

By requesting and reviewing James's medical records related to the accident, State Farm was engaged in an active investigation of James's bodily injury claim during this time period. As an active investigation into an insured's claim justifies a delay in payment, *see Caldwell*, 686 So. 2d at 1098, we agree with State Farm that there was a legitimate basis for this six-week delay.

### 3. *No Legitimate Basis for Delay: July 20-October 4, 2006 (~11 weeks)*

State Farm argues its active investigation of James's claim provides an arguable or legitimate basis for its payment delay. Because State Farm was not actively investigating James's claim during this time period, we hold that James has met her burden of demonstrating by a preponderance of the evidence that State Farm did not have an arguable reason for this eleven-week period of delay.

During this time period, James continued to receive medical treatment for her injuries, about which she continued to apprise State Farm. On July 25, 2006, James reported to Powell that her doctors attributed her medical problems to the motor vehicle accident. On July 30, 2006, State Farm received a bill from Staggs, which indicated that James was being treated for a thoracic compression fracture.

Although Powell's July 20 review of James's medical records recognized that James's symptoms might be due to a pre-existing injury that would not be

eligible for coverage under James's UM motor vehicle coverage, State Farm did not act on this concern until October 5, 2006. On that date, Powell sent James a letter asking her to call to discuss the claim and, in the subsequent phone call, she apprised James of her questions about whether the injuries were caused by a pre-existing injury. The record does not show that Powell received any additional information bolstering her concern about a potential pre-existing injury during this time. Between July 20, 2006 and October 5, 2006, Powell spoke to James at least twice, but Powell admitted in her deposition that she did not discuss her pre-existing condition concerns "in detail." Nor does the record provide any evidence that Powell raised these concerns with James prior to October 5, 2006.

Because State Farm was not conducting any investigation during this time period, we conclude that it was not acting in accordance with its duty under Mississippi law "to perform a prompt and adequate investigation." *Broussard*, 523 F.3d at 627 (citation omitted). State Farm has provided no explanation for its failure to inquire further into its concerns during this nearly three-month period. Critically, State Farm does not point to any evidence in the record that Powell received any additional information during this time before she contacted James on October 5, 2006 to obtain prior medical records. It thus follows that Powell could have sought this information in July. State Farm's inexplicable delay in seeking these records did not comport with its duty to conduct a prompt investigation.

Accordingly, we hold that James has satisfied her burden of demonstrating that State Farm had no arguable or legitimate reason for this eleven-week delay between July 20 and October 4, 2006.

No. 11-60458

*4. **Legitimate Basis for Delay: October 5, 2006–January 16, 2007
(~14 weeks)***

State Farm argues its active investigation of James's claim provides a legitimate or arguable basis for its delay. We agree with this contention for the time period lasting from October 5, 2006 through January 16, 2007.

During this period of time, Powell acted on her concern that James's injury may have pre-dated the accident. On October 5, 2006, Powell sent James a letter asking her to call to discuss the claim. The letter stated, "If I can obtain some of your prior records, I may then be in a position to evaluate your uninsured motorist claim." On October 9, 2006, James disclosed to Powell that she had fallen on concrete over twenty years ago and had been treated for lower back pain at that time, but had not been recently treated for any back problems. James also provided the names of all of her doctors to Powell.

On October 10, 2006, Powell sent James an authorization for release of prior medical records. On October 19, 2006, Powell wrote James a letter, reminding her to return the medical authorization that would allow the release of her prior medical records. On October 27, 2006, James left a message for Powell, stating that she would not sign the medical authorization. The same day, Powell sent James a letter acknowledging James's refusal. The letter noted in reference to some of the medical records State Farm had obtained, "As you can see, this does not clearly relate your ongoing treatment to an injury sustained in the accident and I am merely trying to determine if you had to treat for any of these pre-existing conditions prior to the accident [or] if they became symptomatic following the loss. I do not know if I will be able to properly evaluate your claim without that information, but I am waiting on some information from Dr. Staggs at this time." On October 30, 2006, James called Powell to let her know that she would sign the medical authorization. James

then executed the prior records release on November 1, 2006, and State Farm received it on November 6, 2006.

On October 27, 2006, State Farm sent a letter to Staggs, requesting all of James's medical records. The letter elaborated, "I am trying to determine if [the thoracic compression fracture for which Staggs was treating James] was caused by the accident of February 3, 2006, since the intial radiology report indicated that this injury was probably old. If your notes do not comment on what injuries were caused in this accident or how the accident may have affected any pre-existing injuries, please advise via letter." State Farm sent Staggs a second request for James's medical records on November 17, 2006. On January 16, 2007, Total Pain Care responded to State Farm's medical records request, but advised that records prior to August 14, 2006 needed to be requested from a different facility. Powell did not contact Staggs again.

Seeking further clarification from the insured's treating physician as to the cause of the insured's injury is a legitimate basis for a delay of payment. Therefore, we conclude that State Farm's actions in attempting to resolve its questions via James's treating physician met State Farm's low burden to provide a legitimate justification for its delay during this time period.

### 5. *No Legitimate Basis for Delay: January 17, 2007-July 11, 2007 (~25 weeks)*

State Farm asserts its active investigation of James's claim provides a legitimate or arguable basis for its delay. Because State Farm was not engaged in an active investigation between January 17, 2007 and July 12, 2007, we reject this argument. State Farm also presses that James's lawyer, Joe Clay Hamilton, failed to provide medical records, the delay of which should not be attributed to State Farm. Because the record contains no evidence that State Farm informed James's lawyer that it was concerned about the etiology of James's injuries, we decline to attribute the delay to James. State Farm also

argues that the delay is attributable to Staggs, whose medical records allegedly caused further confusion as to the cause of James's injuries. We similarly reject this argument because Staggs sufficiently responded to State Farm's inquiry, and State Farm did not follow up with Staggs to seek further clarification.

On December 11, 2006, Hamilton notified State Farm that he was representing James and advised that he would forward James's medical bills and records when she had completed treatment. The same day, Powell acknowledged Hamilton's representation and added, "Please forward all related medical and wage information you have concerning your client's injuries." Over the next several months, Powell sent Hamilton several letters, requesting "material" for James. Critically, it was not until July 12, 2007 that Powell notified Hamilton that she required prior medical records to fully assess James's claim. State Farm argues on appeal that Staggs' January 16, 2007 medical records further confused its claim representatives, but the record does not disclose that Powell ever mentioned that confusion to Hamilton or the need for prior medical records until her July 12, 2007 letter.

While it is true that Powell sent several letters to Hamilton during this time period to which he did not respond, Powell's letters do not indicate any active investigation into State Farm's concern about the etiology of James's injury. The record does not demonstrate that Powell ever communicated to Hamilton during this time period that she was concerned about the possible pre-existing nature of James's injuries, nor does the record show that Powell indicated to Hamilton that he should seek to gather *prior* medical records, not just evidence of current treatment.[8] Specifically, in her letter, Powell explained that "the initial [radiologist] reports indicated the compression fractures that

---

[8] Indeed, it was not until September 25, 2007 that Powell informed Hamilton that she required one year of prior records from all of James's physicians, whom she specifically named. James had disclosed the names of her physicians to Powell in October *2006*.

Ms. James has are probably old. . . . We will likely need some of her prior records to confirm her condition prior to loss as opposed to following the loss so you may want to request those as well." There is no evidence in the record that Powell obtained these records after she became aware of Hamilton's representation. To the contrary, there is ample evidence that, prior to January 17, 2006, she had these records and had noted the possibility that James's injuries pre-dated the accident. Therefore, the record demonstrates no reason why Powell waited until July 2007 to inform Hamilton of her concerns and her need for prior medical records.

Under Mississippi law, a delay is not attributable to an insurer where the insured or his counsel refuses to cooperate or provide the necessary information. *See Pilate*, 865 So. 2d at 397. If an insured's lawyer advises the insurer to stop its investigation pending his sending medical records, the resulting delay until the lawyer sends the records is attributable to the insured. However, as the burden is on the insurer to gather all necessary medical records, if the insurer fails to inform the lawyer of critical information necessary to further its investigation, the delay in obtaining that information is not attributable to the lawyer but to the insurer. As State Farm did not inform Hamilton that it needed James's prior medical records to resolve questions about the causation of her injuries, State Farm is responsible for the resulting delay in investigating James's claim.

State Farm also argues that its delay should be attributed to Staggs because he did not provide clarification as to whether James's injuries were a result of the motor vehicle accident. We disagree. We do not express an opinion as to whether Staggs's medical records actually were confusing. Instead, we observe that after Powell received Staggs's medical records in January 2007, she never contacted Staggs to seek further clarification nor did she notify Hamilton of her confusion. Moreover, the delay is not attributable to Staggs because, as

17

No. 11-60458

James argues, he reasonably could have believed that he had complied with Powell's request to provide further information. If Staggs believed his records were clear, he needed to provide no further information. That they were unclear to Powell, who did not seek further clarification, is not Staggs's fault and thus is not chargeable to James. *See Stewart*, 846 So. 2d at 204 (citation omitted).

Accordingly, we conclude that James has met her burden of proving that State Farm had no legitimate or arguable basis for delaying its payment during this time period.

### 6. *Legitimate Basis for Delay: July 12, 2007-March 28, 2008 (~8 months)*

We agree that State Farm had a legitimate reason for the eight-month period of delay between July 12, 2007 and March 28, 2008 because State Farm was actively attempting to resolve causation issues related to James's injuries.

As discussed above, on July 12, 2007, Powell informed Hamilton that the medical records presented conflicting information about the age of James's injuries and advised him that "[w]e will likely need some of [James's] prior records to confirm her condition prior to the loss as opposed to following the loss so you may want to request those as well." Powell also talked to Hamilton multiple times in August, and he assured her that he would obtain clarification from Staggs. Once Powell received the medical records from Hamilton, Powell conducted a prompt review and then sought a second opinion from another State Farm employee, who also pointed out the conflicting information about the etiology of the injuries.[9] On September 25, 2007, Powell requested that

---

[9] James contends that this review was improper because the Injury Claim Trainer who evaluated the records was not a medical doctor. However, James has provided no authority to support her claim, so she has waived this argument. *See* Fed R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . citations to the authorities . . . ."); *see also Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (collecting citations) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

Hamilton provide one year of prior records from all of James's doctors. On March 28, 2008, State Farm received, from Hamilton, Staggs's clarification about his medical records.

Therefore, based on the evidence in the record, we conclude that State Farm was engaged in an active investigation of the cause of James's medical condition. As this justifies a payment delay, we conclude that State Farm had a legitimate reason for its delay during this time period. *See Caldwell*, 686 So. 2d at 1098.

### 7. *No Legitimate Basis for Delay: March 29, 2008-July 29, 2008 (~4 months)*

State Farm argues that it paid James's UM claims "in an attempt to resolve and streamline issues of dispute in this case." The record contains little evidence of State Farm's investigative actions during this time period because State Farm's claims file terminates on September 27, 2007.

The evidence in the record shows that James filed suit against State Farm on October 23, 2007. On March 28, 2008, State Farm received Staggs's clarification about his medical records, although State Farm claims this clarification only served to create further confusion. There is no evidence in the record that State Farm received any additional information about James's medical claims between March 28, 2008 and July 29, 2008, when State Farm paid James's claims in full.[10]

"[A]n insured's filing of a suit on the claim does not suspend the insurer's obligation to promptly pay claims that are admittedly owed." Jeffrey Jackson, Mississippi Insurance Law & Practice § 10.2 (2012). There is no evidence in the record that State Farm received any additional information from James after March 28, 2008, yet State Farm waited an additional four months before it

---

[10] For example, Staggs was not deposed until January 2009.

tendered payment. State Farm has not advanced an explanation for this delay nor presented any evidence of additional investigative actions it undertook during this time period, even though it has had ample opportunity to do so over the course of this lengthy litigation. Therefore, we hold that James has met her burden of proving that State Farm had no legitimate or arguable basis for delaying its payment during this time period.

## D.    Conclusion

In summary, this case falls far short of any standard of prompt handling by either side. Compounding this delay is that State Farm's summary judgment motion lay dormant in the district court for over two years. It is inexplicable that an accident that occurred in February 2006 has not moved past the preliminary stages of litigation by the Spring of 2013. All parties will be best served by the expeditious resolution of this case.

After our careful review of the lengthy summary judgment record, we hold as a matter of law that State Farm had no arguable or legitimate basis for about fifty-three weeks of its delay, from July 20, 2006 through October 4, 2006, from January 17, 2007 through July 11, 2007, and from March 29, 2008 through July 29, 2008. Because James established, as a matter of law, that State Farm had no arguable or legitimate basis for these periods of the delay, she is entitled to present her compensatory damages claim to a finder of fact upon remand.[11] We make no determination as to whether James is entitled to present the issue of punitive damages to a jury.

---

[11] The dissent asserts that the record shows "at most . . . mere negligence on the part of State Farm" and that negligence alone is insufficient to support a trial on compensatory damages. *Post*, at 6. Neither party asserted that State Farm's delay was due to negligence. Therefore, we have not considered this issue, nor do we express an opinion on it. Our opinion holds that State Farm has no arguable or legitimate basis for some of its payment delay. When James presents her claim to a fact finder, our opinion does not precludes State Farm from arguing that its delay was attributable to mere negligence. It is for the fact finder to determine whether James is entitled to compensatory damages—and if so, in what amount—given State Farm's delays.

No. 11-60458

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to any breach of contract claim.  We hold as a matter of law that State Farm had no arguable or legitimate basis for its delay between July 20, 2006 through October 4, 2006, from January 17, 2007 through July 11, 2007, and from March 29, 2008 through July 29, 2008.  Therefore, we REVERSE the district court's grant of summary judgment as to James's bad faith claim and REMAND for further proceedings consistent with this opinion.  Given the length of time that has elapsed since James filed suit, we ORDER the district court to proceed expeditiously.

No. 11-60458

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that we should affirm the district court to the extent that it granted summary judgment on James' breach of contract claim. I dissent in the reversal of the grant of summary judgment on James' claim for compensatory and punitive damages for the reasons specifically stated by the district court in its opinion, attached hereto as an Appendix. I disagree with the majority's conclusion that State Farm had no arguable or legitimate basis for delaying payment to James on her uninsured motorist claim from July 20, 2006 through October 4, 2006, from January 17, 2007 through July 11, 2007, and from March 29, 2008 through July 29, 2008.

The majority holds State Farm had no legitimate basis for delay from July 20, 2006 until October 4, 2006 because, despite State Farm's determination that James' symptoms might be due to pre-existing injuries, State Farm did not "act on this concern" until October 5, 2006, when Powell wrote to James asking her to call to discuss her claim. *Ante*, at 13. Despite the fact that during this period State Farm's activity log indicates Powell made multiple attempts to reach James, and Powell and James had at least three conversations, the majority holds that State Farm was not actively investigating James' claim because Powell stated in her deposition that she did not discuss James' pre-existing condition concerns "in detail" during her conversations with James during this period, *Ante*, at 13. On July 18, 2006, just two days prior to the start of this period, Powell sent medical record requests to six different facilities. When Powell noted on July 20, 2006, that the medical records from Wayne General indicated degenerative changes, State Farm could not yet make a conclusive determination with respect to James' symptoms because medical record requests made to five other facilities were still outstanding. During the following six weeks Powell continued to follow up on requests for medical records and pay

22

invoices for records. Therefore, in light of the facts that the etiology of James' injury was in doubt, State Farm had multiple outstanding medical record requests, and Powell made multiple attempts to reach James and had at least three conversations with James during the six-week period, I cannot agree that State Farm did not have a legitimate basis for delaying payment on James' claim during this period.

The majority holds that State Farm had no legitimate basis for delay from January 17, 2007 through July 11, 2007 because even though State Farm did not yet have the requisite medical records to evaluate James' claim, during this period State Farm did not specifically communicate "the need for prior medical records" to James or her attorney, Hamilton. *Ante*, at 15–18. The majority holds, "[b]ecause the record contains no evidence that State Farm informed James' lawyer that it was concerned about the etiology of James' injuries, we decline to attribute the delay to James." *Ante*, at 15. State Farm did, however, request James' medical records from (1) James on October 5, 2006 and October 27, 2006 (2) James' doctor, Dr. Staggs, on October 27, 2006 and November 17, 2006 and (3) Hamilton on December 11, 2006, May 3, 2007, and June 13, 2007. Letters from Powell to James and Dr. Staggs clearly state the need for prior medical records in order to fully assess James' claim and determine the etiology of James' injury. An October 5, 2006 letter to James stated: "If I can obtain some of your prior records, I may then be in a position to evaluate your uninsured motorist claim." The follow-up letter on October 27, 2006 was even more specific: "I am merely trying to determine if you had to treat for any of these pre-existing conditions prior to the accident or if they became symptomatic following the loss. I do not know if I will be able to properly evaluate your claim without that information, but I am waiting on some information from Dr. Staggs at this time." A letter to Dr. Staggs, sent first on October 27, 2006 and again on

No. 11-60458

November 17, 2006 explained: "I am trying to determine if this was caused by the accident of February 3, 2006, since the initial radiology report indicated that this injury was probably old. If your notes do not comment on what injuries were caused in this accident or how the accident may have affected any pre-existing injuries, please advise via letter. In a letter from Hamilton on December 7, 2006, Hamilton stated he would "forward to you [State Farm] copies of all medical bills and medical records when my clients have completed treatment. Powell acknowledged receipt of Hamilton's letter. And, in accordance with the practices Powell and Hamilton had established over their 30 years of prior dealings, as well as Hamilton's December 7, 2006 letter indicating he would send the records, Powell waited for Hamilton to send a medical records package. In State Farm's activity log, Powell noted again on January 22, 2007 that Hamilton would send all material when he has it. Powell followed up with Hamilton on May 3, 2007 and June 13, 2007, reminding him to forward James' medical records when they became available, but Hamilton did not respond. The conflict between, on the one hand, Dr. Staggs' report indicating the injuries were new, and on the other hand, notes from an office visit indicating the fractures were old, radiology reports stating the injuries were likely chronic, and James' own report of a prior back injury, was not resolved, if at all, until March 28, 2008 when Dr. Staggs clarified by fax that his opinion was that James' injuries were new.[1] In Dr. Staggs' deposition, he acknowledged the lack of clarity, confusing nature, and misleading language in the reports multiple times. In light of the conflicting reports and State Farm's efforts to

---

[1] Dr. Staggs' clarifying fax consisted only of the words, "According to my 7/6/06 notes those fractures were recent at that time."

24

obtain the required medical records from James, Dr. Staggs, and Hamilton, and Powell's reasonable belief that Hamilton would send the records when he had them, I cannot agree that State Farm had no arguable basis for delaying payment on James' claim during this period.

The majority holds State Farm lacked an arguable basis for delaying payment on James' claim from March 29, 2008, the day after State Farm received the clarifying fax from Dr. Staggs, until July 29, 2008, when State Farm tendered payment on James' uninsured motorist claim. *Ante*, at 19–20. While Dr. Staggs' fax clarified his opinion on James' injuries, the radiology reports conflicted with Dr. Staggs' fax and State Farm never received some of James' prior medical information, initially requested in October 2006.[2] In his deposition Dr. Staggs stated (1) the radiology reports were inconsistent with his finding that the injuries were new, (2) the CT showed evidence of a preexisting injury, and (3) there were inconsistencies in James' medical records as to the origin of her injury. Even assuming Dr. Staggs' fax provided sufficient information to clarify the inconsistences, upon receiving Dr. Staggs' fax, State Farm needed at least some reasonable amount of time to review James' claim in light of the new information. The bad faith clock does not begin to tick "as soon as there is any information available that could subsequently be considered as sufficient evidence to support the payment of [the claim]." *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 399 (Miss. Ct. App. 2004) (holding insurer did not act in bad faith in delaying payment on claim even five months after receiving sufficient

---

[2] Powell logged a package of medical records as received from Hamilton on August 31, 2007. Powell wrote to Hamilton on September 25, 2007, requesting prior medical records from Dr. Byrd, Dr. Green, and Dr. Daggett, but Hamilton never responded to this request.

medical records to make determination regarding disability); *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1098 (Miss. 1996) (affirming grant of summary judgment to insurer on bad faith claim even though insurer delayed payment for six weeks after it completed investigation). Therefore, State Farm did not lack an arguable basis for delaying payment on James' claim from March 29, 2008 through July 29, 2008.

Moreover, the majority cites no authority in support of its methodology of dividing the investigation into different intervals and selecting intervals of apparent inaction for which the plaintiff is entitled to present a claim for compensatory damages to a jury. The parties have not cited, nor have we found, any Mississippi Supreme Court case suggesting that in bad faith delayed payment claims courts should parse out intervals of apparent inaction when the record as a whole indicates repeated attempts to obtain the records necessary to determine liability.

The district court's more holistic approach of evaluating whether State Farm's actions throughout the course of its investigation rose to the level of an independent tort is more in line with precedent. To prove bad faith, whether in a denial of payment or a delay of payment case, the plaintiff must show the insurer had no arguable basis for denying or delaying payment on the claim. *Id.* at 871. "[T]he plaintiff bears a heavy burden in demonstrating to the trial court that there was no reasonably arguable basis for denying the claim." *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006). "An arguable reason has been defined by this Court as nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to [the] heightened level of an

independent tort."[3] *Id.* (quoting *Universal Life Ins. Co. v. Veasley*, 610 So.2d 290, 293 (Miss. 1992)).  Where the record at most demonstrates mere negligence, an insurer's actions do not rise to the level of an independent tort.  *Id.*  Assuming for the sake of argument that the majority is correct that State Farm's investigation lacked diligence during certain intervals, the majority at most demonstrates mere negligence on the part of State Farm.  *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1187 (Miss. 1990) ("[A]s a matter of law, ordinary torts, the product of forgetfulness, oversight, or the like, do not rise to the heightened level of an independent tort . . . .") (internal quotation marks omitted).  Concluding that during particular intervals State Farm's investigation was inactive, the majority holds James is entitled to present her compensatory damages claim to a finder of fact upon remand.  *Ante,* at 20.  In *Windmon v. Marshall*, however, the Mississippi Supreme Court held that where the insurer's conduct in delaying payment on a claim did not rise to the level of an independent tort, a trial on compensatory damages was improper.  926 So. 2d at 875; *see Fulton v. Mississippi Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 288 (Miss. 2012) ("[T]his Court has noted that mere negligence, without bad faith, 'is not such an independent tort that would support extracontractual damages.'"

---

[3] The majority separates the inquiry of whether State Farm had an arguable or legitimate basis for its payment delay from whether State Farm's actions amounted to mere negligence. *Ante*, at 20 n.11. *Windmon* squarely contradicts this approach, as the Mississippi Supreme Court held the two inquiries are inseparable. *Windmon*, 926 So. 2d at 872. The majority also states "that neither party asserted that State Farm's delay was due to negligence." *Ante*, at 20 n.11. In State Farm's brief, however, while not admitting to negligence, State Farm alleges that in any event, the delay was not so unreasonable as to constitute an independent tort. *See Brief of Appellee* at 29, 52, 54–55.

(quoting *Veasley*, 610 So.2d at 295)).[4] As James was in large part responsible for the delay, the etiology of James' injury was legitimately in doubt, and State Farm made numerous unsuccessful attempts to obtain the required records from James, her doctors, and her attorney, the facts in this case do not rise to the level of an independent tort. Accordingly, I agree with the district court that summary judgment was appropriate on James' compensatory and punitive damages claims.[5]

Respectfully, I dissent.

---

[4] The Mississippi Supreme Court's holding in *Fulton v. Mississippi Farm Bureau Casualty Insurance Company*, that by awarding the plaintiff compensatory damages, the jury did not necessarily find the insurer liable for an "independent and intentional tort," is not inapposite. 105 So. 3d at 288. The court repeatedly stressed that the propriety of the jury's award of compensatory damages was not at issue. *Id.* at 289. Thus, the court did not hold that a jury *may* award compensatory damages absent conduct rising to the level of an independent tort, but rather held where a jury has awarded compensatory damages and the propriety of those damages is not at issue on appeal, courts cannot infer that the jury necessarily found an independent tort. *Id.* at 290 n.25 ("[W]ithout a finding, the court cannot assume the jury found conduct rising to the level of an intentional tort, amounting to gross negligence or recklessness, thus warranting extracontractual damages." (citing *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So.2d 192, 201 (Miss. 2002))).

[5] Given my agreement with the district court that State Farm had an arguable basis for delaying payment on James' claim, I need not address the issue of punitive damages. Even if, however, State Farm had no arguable basis for delay, punitive damages would be improper. "In order to recover punitive damages from the insurer for bad faith, the insured must demonstrate that the insurer's breach of the insurance contract 'results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort.'" *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (quoting *Caldwell*, 686 So. 2d at 1095). I agree with the district court that the facts here do not present a genuine issue of material fact as to whether that standard was met.

No. 11-60458

No. 11-60458

# Appendix

No. 11-60458

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**FAITH JAMES and LARRY JAMES**                                   **PLAINTIFFS**

**VS.**                                        **Civil Action No. 4:07-cv-137-HTW-LRA**

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY**                                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Before this court are the following motions filed by defendant State Farm Mutual
Automobile Insurance Company: Motion for Summary Judgment filed pursuant to Rule
56 of the Federal Rules of Civil Procedure[1] **[Docket No. 63]**; Motion to Strike
Supplemental and Rebuttal Opinion of Peter J. Quave **[Docket No. 76]**; Motion to
Exclude Expert Testimony of Peter J. Quave **[Docket No. 65]**; and Motion to Strike
Third Motion for Leave to File Supplemental Materials **[Docket no. 101]**. Also before
the court are five motions filed by plaintiff Faith James: Motion for Review of Magistrate
Judge Order **[Docket no. 82]** concerning Docket Nos. 60, 78 and 58 filed under the
authority of Rule 72 of the Federal Rules of Civil Procedure[2] and Rule 72.1 of the

---

[1] Fed. R. Civ. P. 56(a) provides:

A party may move for summary judgment, identifying each claim or defense - or
the part of each claim or defense--on which summary judgment is sought. The
court shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter
of law. The court should state on the record the reasons for granting or denying
the motion.

[2] Fed. R. Civ. P. 72(a) provides, in pertinent part:

[a] party may serve and file objections to the order within 10 days after being

1

No. 11-60458

Uniform District Court Rules;[3] Motion in Limine Regarding Certain Medical Records **[Docket No. 83]**; Motion for Leave to File Supplemental Materials in Opposition to Summary Judgment **[Docket no. 92]**; Motion to Supplement Opposition to Defendant's Motion for Summary Judgment **[Docket no. 96]** and Third Motion for Leave to File Supplemental Materials in Opposition to Motion for Summary Judgment **[Docket no. 99]**.

This court has jurisdiction over this case pursuant to the jurisdictional grant of Title 28 U.S.C. § 1332[4] based on the diversity of citizenship of all parties and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

### I. Background

On February 3, 2006, Faith James and Jarvis Smith were involved in an automobile accident in Shubuta, Clarke County, Mississippi [Amended Complaint, Docket no. 15]. Plaintiff was driving a 2002 Jeep Wrangler in a northerly direction on United States Highway 45, while Smith was in a 2006 Mercury Grand Marquis. According to plaintiff, Smith failed to stop at a stop sign at the intersection of United States Highway 45 with County Road 212, and then collided with plaintiff's vehicle. The car accident, says James, was totally the result of Smith's negligence, carelessness

---

served with a copy . . . The district court judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

[3] UNIF. LOC. R. 72.1 provides, in pertinent part: "A party aggrieved by a magistrate judge's ruling may appeal the ruling to the assigned district court judge. . ."

[4] Title 28 U.S.C. § 1332 states, in pertinent part, that "(a) [t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and is between– (1) citizens of different States;. . .."

2

## No. 11-60458

and unlawful actions. James claims she suffered a herniated disk, three fractured vertebras and other injuries. James' passenger, Teresa Lugardo, also suffered various injuries.

James had coverage under four standard automobile insurance policies issued to her and her husband Larry James by State Farm Mutual Automobile Insurance Company ("State Farm"), all of which were in effect at the time of the accident. The liability limit for Uninsured Motorist ("UM") Coverage for each policy was $10,000.00 per person, with a stacked total per person limit of $40,000.00. Each policy also included Collision Coverage with a liability limit of $100,000.00 as well as Medical Payments Coverage with a liability limit of $5,000.00 [Docket no. 63-2].

Faith and Larry James filed suit in this court on October 23, 2007, against State Farm and filed an amended complaint on February 13, 2008, alleging that State Farm had wrongfully failed to meet its obligation to pay UM coverage benefits. Plaintiffs seek UM coverage benefits in the sum of $40,000.00;[5] compensatory damages in the amount of $150,000.00; punitive damages in the amount of $20,000,000.00; and costs.

On August 29, 2008, State Farm issued four checks payable to Faith James, Larry James and Hamilton Law Firm for $10,000.00 each, totaling $40,000.00 under her UM coverage [docket no. 67-8]. Exactly two months later, on October 29, 2008, State Farm filed a motion for summary judgment.

### II. State Farm's Motion for Summary Judgement

This court shall grant summary judgment if the movant shows that there is no

---

[5]Collision and Medical Payment Coverage benefits were paid with respect to this accident prior to plaintiffs having filed suit and are not in dispute.

3

No. 11-60458

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In determining whether a genuine dispute exists as to any material fact, the court must consider all of the evidence in the record but refrain from making any credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The court makes all reasonable inferences in favor of the non-moving party, *Reeves*, 530 U.S. at 150; "however, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence,'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

## A. Uninsured Motorist Coverage Benefits

State Farm has paid the full $40,000.00 of UM coverage benefits to plaintiffs. Plaintiffs do not contest this fact. State Farm, thus, is entitled to an entry of summary judgment on plaintiffs' claims for UM benefits.

## B. Punitive Damages

Plaintiffs allege that State Farm acted in bad faith in delaying payment of Faith James' UM claim; consequently, punitive damages are warranted. With the present

4

No. 11-60458

matter before this court under a grant of subject matter jurisdiction owing to diversity of citizenship, this court applies the substantive law of Mississippi to this dispute. *Erie R.R. Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Mississippi law is well-settled that "punitive damages should be assessed with caution and within narrow limits as an example and warning" and that a "plaintiff has a 'heavy burden' when seeking punitive damages based on a bad faith insurance claim." *Sobley v. S. Natural Gas Co.*, 302 F.3d 325, 338 (5th Cir. 2002) (quoting *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232 (Miss. 2001) (en banc) (quoting *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 622 (Miss. 1988) (en banc)). "[T]he Mississippi Supreme Court has been extremely reluctant to allow punitive damages in cases where the insurer did not deny coverage, but only disputed the amount of the claim or delayed payment." *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1099 (Miss. 1996) (quoting *Tutor v. Ranger Ins. Co.*, 804 F.2d 1395, 1399) (reversing jury award of punitive damages where the insurance company investigated the claim, determined it to be valid, disputed the amount to be paid and delayed payment while those issues were resolved)).

In order to recover punitive damages under Mississippi law, plaintiffs must show by clear and convincing evidence "that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a). If the insurer had a legitimate or arguable reason to deny payment of the claim, the trial judge should refuse to allow the issue of punitive damages to be tried. *Caldwell*, 686 So. 2d at 1096. Arguable reason is defined as "nothing more than an expression indicating the act or acts of the alleged tort-feasor do

5

No. 11-60458

not rise to heightened level of an independent tort." *Id.* Once the insurer presents an arguable reason, the burden is on the insured to demonstrate that the insurer has no arguable reason to refuse to pay the claim or to perform its contractual obligation and committed an intentional tort. *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008); *Caldwell*, 686 So. 2d at 1097; and *Benson v. National Union Fire Ins. Co.*, 762 So. 2d 795, 799 (Miss. Ct. App. 2000).

Plaintiffs make four arguments concerning how State Farm acted in bad faith. The first two require no analysis of whether State Farm had an arguable reason. First, plaintiffs argue that State Farm withheld payment under one coverage in order to coerce a lower settlement for claims under other coverage. Plaintiffs have presented neither evidence in the record suggesting such coercion occurred nor legal authority stating that State Farm had such a duty in this case. This contention is rejected.

Secondly, say plaintiffs, State Farm, as the issuer of the primary policy in this case, wrongly withheld payment in violation of the terms of the policy it issued to plaintiffs. Plaintiffs also argue that State Farm issued the primary policy and thus, at least $10,000.00 from one of the policies should have paid immediately upon evaluating the claim as exceeding the $10,000.00 policy limit of each policy.[6] Plaintiff contends that failure to do so constituted violation of its own policy, a factor suggesting bad faith. *See Travelers Indem. Co. v. Wetherbee*, 368 So. 2d 829, 834 (Miss. 1979) (punitive damages instruction properly granted in part because "the plain terms of the policy requiring payment within sixty days of the proof of loss were ignored"). Plaintiffs direct

---

[6]Plaintiff does not provide within this argument the date on which she alleges such knowledge was demonstrated.

6

No. 11-60458

the court to Section III - Uninsured Motorist Vehicle – Coverages U and U1 [docket no.

63-2, pp. 14-16]. In the last subsection of that section, which plaintiffs cite, the policy

states:

**If There Is Other Coverage**

1. If uninsured motor vehicle coverage for bodily injury is available to an
insured from more than one policy provided by us or any other insurer,
any coverage applicable under this policy shall apply:
    a. On a primary basis if the insured sustains bodily injury while
occupying your car, or while not occupying a motor vehicle or trailer.
    b. On an excess basis if the insured sustains bodily injury while
occupying a vehicle other than your car.

2. Subject to item 1 above, if this policy and one more than other policies
provide coverage for bodily injury;
    a. On a primary basis, we are liable only for our share. Our share is
that percent of the damages payable on a primary basis that the limit
of liability of this policy bears to the total of all applicable uninsured
motor vehicle coverage provided on a primary basis.

This court finds no support for plaintiffs' argument in the policy excerpt it cites.

Plaintiffs do not cite an excerpt that holds State Farm to a certain timeline with respect

to payment of uninsured motorist coverage as was the case in *Travelers*, 368 So. 2d at

834. The excerpt plaintiffs cite simply outlines liability for UM coverage when there is

more than one UM coverage policy. State Farm determined it had obligations under all

four UM coverage policies held by plaintiffs, and it is undisputed that State Farm paid

the full amount due under all of those policies. Plaintiffs' argument has no merit.

Plaintiffs have not shown that State Farm violated the terms of the policy plaintiffs held.

This court will now turn to analysis of State Farm's arguable reason. State Farm

claims it did not wrongfully withhold payment on plaintiff's UM coverage claim. State

Farm says the reason for the delay in payment of plaintiffs' claim for UM coverage was

7

No. 11-60458

an ongoing investigation of the claim due to issues concerning medical causation and evaluation of the claim. State Farm asserts that at all times, it acted on a good faith basis attempting to obtain all relevant information through Faith James' medical providers and through plaintiffs' counsel, but such information was never provided. Plaintiffs respond that the records were clear, and no causation issue was presented. Plaintiffs also contend that State Farm failed to conduct a prompt and adequate investigation of Faith James' medical history.

A review of the relevant facts, as presented in the record, will assist the court in addressing plaintiffs' remaining two arguments and determine whether they demonstrate that State Farm in fact has no arguable reason and has committed an intentional tort in the processing of this claim.

State Farm's activity log [Docket no. 63-29] shows that it learned of the accident by February 7, 2006. State Farm paid all Collision Coverage benefits during the month of February. State Farm paid Medical Payments Coverage benefits between February 20, 2006, and April 20, 2006, when total payments under the Medical Payment Coverage reached the liability limit. Upon exhaustion of Medical Payment Coverage, State Farm mailed Faith James a copy of a letter explaining that the coverage had been paid to the limit as well as a letter outlining the payments that had been made on her behalf under that coverage [Docket no. 63-16]. State Farm paid either directly to plaintiffs or on their behalf a total of $17,601.25 in Collision Coverage benefits [Docket no. 63-29]. During this time, State Farm spoke with Faith James by telephone about her medical bills.

8

USCA5 1405

No. 11-60458

On March 24, 2006, Gina Robertson, State Farms claim adjuster, made an entry in the activity log stating that Smith appeared to be at fault [Docket no. 63-8 and 63-29]. The entry also reflected that Robertson spoke with someone at the firm that represented Lugardo[7] and was informed that Progressive Insurance indicated to the law firm that it had a policy on the car driven by Smith at one time that was no longer in force.  Robertson noted that she obtained the number to Progressive from the law firm and would follow-up with Progressive in order to confirm coverage or the lack thereof. State Farm called Progressive several times during March and April and informed Faith James by telephone that it was attempting to determine whether coverage from Progressive would apply to the accident. On April 19, 2006, Robertson reached a Progressive employee who informed State Farm that the file was in review status due to some pending coverage issues. On or before May 30, 2006, during a phone call made by Robertson, a Progressive employee told Robertson that Progressive would not provide coverage for the claim at issue. Thus, State Farm determined that UM Coverage would apply. On May 31, 2006, State Farm called Faith James and informed her that they could probably proceed to process her claim under UM Coverage.

In May, State Farm reviewed unreviewed medical documents and paid a medical records fee to Wayne General Hospital in order to obtain medical records. Faith James had been examined in the emergency room at Wayne General Hospital on February 3, 2006, the date of the accident.

---

[7] *supra*. Lugardo was Faith James' passenger during the accident.

9

No. 11-60458

On June 5, 2006, State Farm requested from Rush Foundation Hospital Pain Treatment Center all medical records and reports incurred to date as a result of the February 3, 2006 accident [Docket no. 67-2]. State Farm received the records on June 21, 2006 [Docket no. 63-29]. The records [Docket no. 67-2] describe Faith James' visits of May 8, 2006; May 11, 2006; and June 1, 2006, with Ken Staggs, M.D. The summary from May 8, 2006, describes injuries in the thoracic vertebrae, stating:

> [Faith James] has compression fractures at T2, T3, T5 and T11 all ensuing from a motor vehicle accident presumed February 3, 2006 as there is edema on the MRI indicating that these are new. She will need to be checked with a bone density as well.

Medical records were being requested and processed internally during June and July. On July 17, 2006, State Farm received the medical records [Docket no. 63-11] from Wayne General Hospital summarizing the findings from an examination of Faith James on February 3, 2006, subsequent to the accident. Radiologist Dr. Ronald W. Gatewood stated in his radiology report that from an "incomplete" and "limited" exam, he determined as to the thoracic spine of Faith James that "[t]here is loss of vertebral body height of multiple thoracic vertebra, approximately T7-T10. This is probably chronic." He states similarly again "loss of verterbral body height of multiple vertebra, approximately T7-T10 of uncertain age, probably old." Finally, he comments from images obtained of the thoracic spine that "[the] radiograph demonstrated mild compression of multiple mid and lower thoracic vertebral. There appear to be hypertrophic degenerative changes. However, no definite acute fracture is identified through the levels images." He found "no evidence of acute bony injury" in the thoracic spine from T5 to T12.

USCA5 1407

No. 11-60458

On the next day, July 18, 2006, State Farm claims representative Renee Powell noted [Docket no. 63-29] that the total for medical bills on file for Faith James was $6,849.58 and commented on Dr. Stagg's abovementioned findings, stating that "[i]f records do not show any more evidence of pre-existing issues, it seems that the medical records are supporting that her problems are a result of the [accident]. If this is the case, [the estimated range of claim value] is $20,000.00 to $25,000.00. . . .[The uninsured motorist] limit per person is $40,000.00. . . . and [this claim] would approach this amount if surgery is done."

Powell and Faith James communicated numerous times about James' condition and treatment and the status of James' UM coverage claim through the months of July, August, September and October of 2006 [Docket no. 63-29]. In an October 9, 2006 conversation, James informed Powell that she had fallen on concrete over twenty years ago and received treatment for her lower back at that time, but has not been treated for any back problems in recent years.

On October 27, 2006, Powell sent Dr. Staggs a letter requesting all records and charges regarding Faith James so that State Farm could determine if the thoracic compression fracture he was treating was caused by the February 3, 2006, accident, since the initial radiology report indicated that the injury was probably old [Docket no. 63-23]. Powell further requested that Dr. Staggs' explain by letter, to the extent his notes did not do so, which injuries were caused by the accident and how the accident affected pre-existing injuries. Powell sent a second request to Dr. Staggs on November 17, 2006 [Docket no. 63-29].

11

No. 11-60458

Attorney Joe Clay Hamilton notified Powell by letter on December 7, 2006, that he was now representing Faith James [Docket no. 63-26]. The letter stated he would forward to Powell all copies of medical bills and medical records when Faith James completed treatment. Powell responded by letter on December 11, 2006, informing that she wanted to begin evaluation of Faith James' injuries as soon as possible and requesting that Hamilton forward all medical information [Docket no. 63-27]. Powell said it was customary between her and Hamilton during their thirty-year relationship of handling claims together that once Hamilton sends a letter of representation, he sends her a package of information as he said he would [Docket no. 63-7].

State Farm processed medical records November 2006 through January 2007. State Farm records [Docket nos. 63-28, 63-29 and 63-30] reflect that March 2007 through June 2007 State Farm was waiting on information that Hamilton agreed to send concerning the claim.

On July, 12, 2007, Powell sent Hamilton all bills and records on file on Faith James and requested all Faith James' medical bills and records, including from Dr. Staggs, in order to gain clarification as to the compression fractures since the initial radiologist report indicated that they were old [Docket no. 63-29 and 63-32]. Powell also advised Hamilton that she would likely need to request prior records in order to assess Faith James's pre-accident and post-accident physical condition. Powell determined that the value of the potential UM claim on July 13, 2007, as determined from bills in their records, was $13,570.35, but if she received documentation that the compression fractures either did not exist prior or were asymptomatic prior to the accident and additional medical treatment was needed, the value of the claim could

12

No. 11-60458

increase to the $40,000.00 policy limit.

After multiple instances of correspondence between Powell and Hamilton in August 2007, Hamilton informed Powell that he would obtain clarification from Dr. Staggs [Docket no. 63-29]. On August 27, 2007, Hamilton wrote Powell, stating that he was sending, along with the letter, medical records of Faith James for review under UM coverage and that Faith James had as of that date incurred $44,358.46 in medical bills [Docket no. 63-34]. Hamilton further repeated Dr. Staggs' findings that Faith James' fractures were a result of the February 3, 2006, accident. Hamilton closed the letter with a request that Powell contact him as soon as review of the medical records was complete so they could discuss settlement. State Farm received the package of medical records from Hamilton on or before August 31, 2007 [Docket no. 63-29].

On September 12, 2007, Powell reviewed Faith James' medical records and stated [Docket no. 63-29] that "there appear[ed] to be degenerative issues that may have pre-existed" but that she was unable "to find any evidence she was symptomatic prior to [the accident]." On that same day, Powell requested internal review of the medical records and contacted Hamilton to update him on the progress of processing the claim.

On September 20, 2007, the notes from the injury claims review [Docket no. 63-29] entered by Judi Yokum, State Farm injury claim trainer [Docket no. 63-9, p.16], state in part:

> Based on what we have received to date. . . it appears the thoracic
> vertebral compression fractures were pre-existing. It appears [Faith
> James] may have sustained soft tissue injuries superimposed over those
> pre-existing fractures. It is unknown at this time if the [treatments] were
> medically necessary because of a pre-existing condition, an acute injury,

13

No. 11-60458

or a combination thereof.

On September 25, 2007, Powell wrote Hamilton requesting medical records for a year prior to the accident from Faith James' primary care physician in order to determine whether Faith James had been treated previously for fractures and in order to determine if her fractures were related to her pre-existing condition of rheumatoid arthritis [Docket no. 63-35]. Powell subsequently wrote Hamilton that same day requesting the same information from three specific doctors whom Faith James had visited [Docket no. 63-36]. State Farm says plaintiffs did not respond to this request.

Instead, plaintiffs filed suit in this court on October 23, 2007. During the process of discovery, attorney Stephen Wilson of the Hamilton Law Firm sent State Farm's counsel a fax Wilson had received from Dr. Staggs on March 24, 2008 [Docket no. 67-6 and 67-7]. On March 14, 2008, Wilson had sent Dr. Staggs a letter referring to Dr. Stagg's notes from an October 25, 2006, office visit with Faith James in which Dr. Staggs had stated that James had thoracic vertebrae fractures and commenting "these are old fractures." Wilson's letter explained that "there is apparently a contention that Mrs. James had some condition in her thoracic spine that preceded the February 3, 2006 accident" and that State Farm needed him to "clarify via letter what [he] meant by [his] characterization of the fractures as being 'old.'" Dr. Staggs's reply, sent by fax on March 24, 2008, was a signed, handwritten note at the bottom of Wilson's March 14, 2008, letter stating, "[a]ccording to my 7/6/06 notes those fractures were recent at that time." Wilson sent this fax from Dr. Staggs to State Farm on March 28, 2008.

Four months after receiving this fax and almost two and one-half years after the accident, State Farm paid the liability limit of the four policies, issuing four checks in the

14

No. 11-60458

amount of $10,000.00 each to plaintiffs and the Hamilton Law Firm on July 29, 2008 [Docket no. 67-8]. State Farm states in its motion that it issued the checks after reviewing information obtained in the discovery phase of this case and in effort to resolve the entire case by agreement.

State Farm says its reason for the delay in payment is that it was investigating, attempting to determine whether UM coverage would apply and resolve causation issues concerning Faith James' injuries. Plaintiffs' last two arguments – that there was no significant causation issue and that State Farm failed to conduct a prompt and adequate investigation – are contingent on this court's satisfaction that State Farm met the arguable reason threshold. This court is unpersuaded by plaintiffs' arguments and finds that the record demonstrates that State Farm had an arguable reason for delay for the following reasons.

First, the fact that State Farm paid the $10,000.00 limit of UM coverage under each policy is persuasive. *See Caldwell*, 686 So. 2d at 1099 ("The fact the insurer ultimately tendered full payment of a claim is persuasive to this court.") Continuing investigation, when supported by the record, is a reasonable explanation for delay. *Id.* at 1093 (affirming summary judgment on the issue of punitive damages where, after plaintiff requested settlement and filed suit, insurer continued to investigate claim and then paid benefits).

Next, in order to recover punitive damages against an insurance company for bad-faith refusal to pay a claim, or refusal to honor an obligation under an insurance policy, the insured must first demonstrate that the claim or obligation was in fact owed. *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008). State Farm

15

No. 11-60458

had no obligation to pay until it determined that a particularly coverage applied. The record demonstrates that a question was raised as to whether Progressive would supply coverage for Smith's vehicle and that State Farm communicated with both Progressive and the plaintiffs about this issue in a reasonable manner.

State Farm communicated with Progressive numerous times, seeking the status of a determination. Progressive was still reviewing the claim in late April. State Farm learned of Progressive's decision to deny coverage in late May and promptly notified Faith James the next day that it would begin to process her claim for uninsured motorist coverage. The record demonstrates that State Farm needed to wait on a determination from Progressive in order to determine whether UM coverage would apply.

Lastly, the record clearly establishes that causation issues were legitimately studied. State Farm, attempting to work with plaintiffs and keep them informed, worked to resolve the causation issue. State Farm requested and reviewed medical records and clarification concerning medical records from May 2006 through September 2007, just before plaintiffs filed suit. From these medical records, State Farm discovered competing theories as to the cause of Faith James' compression fractures. On February 3, 2006, the day of the accident, Dr. Gatewood reported no fractures or bone injury in the spinal area and commented that loss of height in the thoracic vertebrae was "probably old." Three months later in May 2006, Dr. Staggs diagnosed plaintiff as having compression fractures in the thoracic vertebrae that seemed to be "new," caused by the February 3, 2006 accident. Five months later in October 2006, Dr. Staggs describes Faith James' thoracic vertebra fractures as old. Faith James told Powell that she had a previous lower back injury from a fall. "An insurance company

16

USCA5 1413

No. 11-60458

faced with two separate and distinct medical theories, each of which is supported by reputable physicians [both unassociated with the insurer], and one of which would exclude liability" is indicative that punitive damages should not be assessed. *Bankers Life and Cas. Co. v. Crenshaw*, 483 So. 2d 254 (Miss. 1985). This court easily finds a causation issue in this case.

Moreover, the delay was in part due to actions and/or inactions by plaintiffs' counsel and one of plaintiffs' doctors. *See Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 299 (5th Cir. 2009) ("An insured who fails to provide his insurer with information required to process his claim cannot then claim the insurer acted arbitrarily in delaying payment."). On multiple occasions, State Farm requested clarification from both Dr. Staggs and from plaintiffs. State Farm received medical documents from Hamilton in July 2007 after Hamilton had committed to send them in December 2006. Powell, having worked with Hamilton on claims for thirty years, waited, expecting Hamilton to send them as he usually did. State Farm requested but did not receive, at least not prior to the filing of this suit, medical records prior to the accident and clarification from Dr. Staggs, which Hamilton agreed to obtain. In March 2008, Hamilton sent State Farm Dr. Staggs' response to Hamilton's inquiry for clarification, a handwritten note addressing a July 2006 visit, a visit which neither State Farm nor Hamilton mentioned in their respective requests for clarification.

Obviously, some delay in evaluating claims is inevitable, legitimate and socially useful. *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 394 (Miss. Ct. App. 2004) (citing Jeffrey Jackson, Mississippi Insurance Law § 12:5 (2001)). Insurers are entitled, and in fact legally obligated, to investigate fully the legitimacy of claims, and some

17

No. 11-60458

skepticism in evaluating claims is appropriate. *Id.* Since an insurer has an obligation under Mississippi law to investigate claims, discharging that duty is not bad faith. *Id.* "'[T]he denial of a claim without proper investigation may give rise to punitive damages.'" *United Am. Ins. Co. v. Merrill*, 978 So. 2d 613, 635 (Miss. 2007) (citation omitted). "Proper investigation. . . means obtaining 'all available medical information relevant to [the policyholder's] claim.'" *Id.*

The submitted evidence shows that State Farm attempted to obtain all pertinent medical information in order to resolve the legitimate question of whether all of James' injuries, claimed medical treatment, and bills were caused by the accident on February 3, 2006. State Farm made requests to determine if the accident was the cause of various injuries, such as compression fractures in James' spine; however, at the time plaintiffs filed suit, no medical opinion or report had been provided to indicate that Faith James' claimed ongoing problems and treatment were medically caused by the motor vehicle accident. The evidence does not establish, as plaintiffs argue, that causation was clear and settled prior to payment, or that State Farm engaged in intentional delay tactics.

The standard is not whether State Farm could have investigated the claim in a way that might have resulted in prompter payment of benefits; instead, the standard is whether State Farm lacked a legitimate or arguable reason for the delay and that such delay amounted to a willful or malicious wrong. The facts here do not present a genuine issue as to whether that standard was met. Considering that Faith James' claim was not denied, that the claim was eventually paid and that the record establishes that State Farm was engaged in activities in keeping with the duty imposed upon it to fully

18

No. 11-60458

investigate all relevant facts, this court cannot conclude that State Farm's conduct rose to the level of gross negligence or an independent, intentional tort. *See Caldwell*, 686 So. 2d at 1099.

**C. Expenses**

Plaintiffs argue that even if this court finds no bad faith they are entitled to recover the attorney's fees and other expenses incurred that were reasonable foreseeable in pursuing the amounts State Farm owed her under the four UM policies they held at the time of the accident. Plaintiffs cite *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 270 (5th Cir. 2008) for the statement that:

> When an insurance company breaches its contract with an insured but does not do so in a way that is so egregious as to permit the recovery of punitive damages, the insured in some circumstances will have a right to attorneys' fees and other expenses that were reasonably foreseeable. *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992).

First, the plaintiffs have no breach of contract claim. Secondly, plaintiffs rely on the premise in *Universal Life Ins. Co. v. Veasley* that "extra-contractual damages [can] be awarded in cases involving a failure to pay on an insurance contract *without an arguable reason* even where the circumstances are not such that punitive damages are proper." 610 So. 2d 290, 295 (Miss. 1992) (emphasis added) (citation omitted). The premise behind the award plaintiffs seek does not apply when, as in the present case, a court is satisfied that an arguable reason for delay has been established. For both of these reasons, plaintiffs' request for expenses is denied.

**III. Conclusion**

IT IS, THEREFORE, ORDERED AND ADJUDGED that the defendant's Motion for Summary Judgment **[Docket no. 63]** is granted, and all other motions **[Docket Nos.**

19

USCA5 1416

No. 11-60458

**65, 76, 82, 83, 92, 96, 99 and 101]** are moot. The court will enter a Final Judgment in

accordance with the local rules.

**SO ORDERED, this the 6th day of May, 2011.**

**s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT JUDGE**

Civil Action No. 4:07-cv-137 HTW-LRA
Memorandum Opinion and Order

20

USCA5 1417